# 21-467(L)

## 21-558(CON)

IN THE

# United States Court of Appeals

**FOR THE SECOND CIRCUIT**

74 PINEHURST LLC, 141 WADSWORTH LLC, 177 WADSWORTH LLC, DINO PANAGOULIAS, DIMOS PANAGOULIAS, VASILIKI PANAGOULIAS, EIGHTY MULBERRY REALTY CORPORATION,

*Plaintiffs-Appellants,*

—against—

STATE OF NEW YORK, NEW YORK DIVISION OF HOUSING AND COMMUNITY RENEWAL, RUTHANNE VISNAUSKAS, Individually and in her official capacity as

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS**

JONATHAN M. SPERLING
S. CONRAD SCOTT
JORDAN S. JOACHIM
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 841-1000

MARK W. MOSIER
KEVIN KING
ETHAN A. SACHS
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
(202) 662-6000

*Attorneys for Plaintiffs-Appellants*

Commissioner of New York State Division of Housing and Community Renewal, CITY OF NEW YORK, NEW YORK CITY RENT GUIDELINES BOARD, DAVID REISS, In his official capacity as Chair of the Rent Guidelines Board, CECILIA JOZA, In her official capacity as a Member of the Rent Guidelines Board, ALEX SCHWARTZ, In his official capacity as a Member of the Rent Guidelines Board, GERMAN TEJEDA, In his official capacity as a Member of the Rent Guidelines Board, MAY YU, In her official capacity as a Member of the Rent Guidelines Board, PATTI STONE, In her official capacity as a Member of the Rent Guidelines Board, J. SCOTT WALSH, In his official capacity as a Member of the Rent Guidelines Board, LEAH GOODRIDGE, In her official capacity as a Member of the Rent Guidelines Board, SHEILA GARCIA, In her official capacity as a Member of the Rent Guidelines Board,

*Defendants-Appellees,*

NEW YORK TENANTS AND NEIGHBORS, (T&N),
COMMUNITY VOICES HEARD, COALITION FOR THE HOMELESS,

*Intervenors-Defendants-Appellees.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Plaintiffs-Appellants state that nongovernmental corporate entities 74 Pinehurst LLC, 141 Wadsworth LLC, 177 Wadsworth LLC, and Eighty Mulberry Realty Corporation have no parent corporation and no publicly held corporation owns 10% or more of the stock of any of these entities.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ............................................................................. iv

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................... 3

STATEMENT OF THE ISSUES....................................................................... 4

STATEMENT OF THE CASE.......................................................................... 5

A. New York's Rent Stabilization Law .................................................... 5

1. Rent Stabilization Before 2019 .................................................. 5

2. The 2019 Amendments ............................................................... 7

3. The RSL's Self-Defeating Economics..................................... 12

B. Procedural History.............................................................................. 15

SUMMARY OF ARGUMENT ........................................................................ 18

ARGUMENT ................................................................................................. 21

I. Plaintiffs Plausibly Allege Physical-Takings Claims.................................. 21

A. A Physical Taking Occurs When the Government Authorizes a Person to Occupy Another's Property................................................ 22

B. Plaintiffs Plausibly Allege Facial Physical-Takings Claims. ............ 24

1. The Amended RSL Deprives Owners of the Right to Exclude Others from Their Property. ...................................... 25

2. The Amended RSL Deprives Owners of the Rights to Use and Possess Their Property............................................. 28

3. *Yee* Provides Further Support for Plaintiffs' Claims. .............. 32

C. Plaintiffs Plausibly Allege As-Applied Physical-Takings Claims.......................................................................................... 36

D. The District Court's Reasoning Is Flawed. .......... 38

II. Plaintiffs Plausibly Allege Regulatory-Takings Claims. .......... 42

A. Plaintiffs 74 Pinehurst and 141 Wadsworth Plausibly Allege As-Applied *Penn Central* Claims. .......... 43

1. The District Court Correctly Held That Two *Penn Central* Factors Were Well Pleaded. .......... 44

2. The District Court Erred in Holding that Plaintiffs Lacked Reasonable Investment-Backed Expectations. .......... 46

B. Plaintiffs Plausibly Allege Facial Regulatory-Takings Claims. .......... 50

III. Plaintiffs Plausibly Allege a Due Process Claim. .......... 54

IV. Sovereign Immunity Does Not Shield the State Defendants From Liability. .......... 58

CONCLUSION .......... 61

CERTIFICATE OF COMPLIANCE .......... 63

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1256 Hertel Ave. Assocs., LLC v. Calloway*,
761 F.3d 252 (2d Cir. 2014) ....................................................................49, 50

*6914 Ridge Blvd., LLC v. Delao*,
2020 NYLJ LEXIS 182 (Civ. Ct. Kings Cty. Jan. 28, 2020) ............................26

*8200 Realty Corp. v. Lindsay*,
27 N.Y.2d 124 (1970) ..............................................................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).......................................................................21, 57

*Bass Plating Co. v. Town of Windsor*,
639 F. Supp. 873 (D. Conn. 1986)..........................................................56

*Buhagiar v. DHCR*,
138 A.D.2d 226 (1st Dep't 1988) ...........................................................30

*Cablevision Sys. Corp. v. FCC*,
570 F.3d 83 (2d Cir. 2009) ............................................................23, 24

*City of Los Angeles v. Patel*,
576 U.S. 409 (2015).................................................................................52

*Connolly v. Pension Benefit Guar. Corp.*,
475 U.S. 211 (1986).................................................................................52

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)...........................................................................59, 61

*Duarte v. United States*,
532 F.2d 850 (2d Cir. 1976) ....................................................................59

*Edelman v. Jordan*,
415 U.S. 651 (1974).................................................................................58

*Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Housing & Cmty. Renewal*,
83 F.3d 45 (2d Cir. 1996) ....................................................................40, 41

*First English Evangelical Lutheran Church v. Los Angeles County*,
482 U.S. 304 (1987)....................................................................19, 22, 57, 58

*Hair v. United States*,
350 F.3d 1253 (Fed. Cir. 2003) ..............................................................................59

*Hammond v. Marcely*,
58 N.Y.S. 2d 565 (Mun. Ct. 1945) ....................................................................9, 30

*Harmon v. Markus*,
412 F. App'x 420 (2d Cir. 2011) ....................................................................34, 41

*Hodel v. Irving*,
481 U.S. 704 (1987)..........................................................................................36

*Hodel v. Va. Surface Min. and Reclamation Ass'n, Inc.*,
452 U.S. 264 (1981)..........................................................................................52

*Horne v. Dep't. of Agric.*,
576 U.S. 350 (2015).................................................................................*passim*

*Idaho v. Coeur d'Alene Tribe of Idaho*,
521 U.S. 261 (1997)..........................................................................................58

*John R. Sand & Gravel Co. v. United States*,
457 F.3d 1345 (Fed. Cir. 2006) ..........................................................................23

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979)....................................................................19, 28, 40, 43

*Keystone Bituminous Coal Ass'n v. DeBenedicti*,
480 U.S. 470 (1987)..........................................................................................52

*Knick v. Twp. of Scott, Pa.*,
139 S. Ct. 2162 (2019)................................................................................52, 59

*Leibowitz v. Cornell Univ.*,
445 F.3d 586 (2d Cir. 2006) ..............................................................................21

*Leistiko v. Sec'y of Army*,
922 F. Supp. 66 (N.D. Ohio 1996) ....................................................................59

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005)....................................................................................45

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982)...........................................................................*passim*

*Manning v. N.M. Energy, Minerals & Nat. Res. Dep't*,
144 P.3d 87 (N.M. 2006) ............................................................................60

*Murr v. Wisconsin*,
137 S. Ct. 1933 (2017)................................................................................43

*Nollan v. Cal. Coastal Comm'n*,
483 U.S. 825 (1987)...............................................................................23, 40

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001)...................................................................43, 48, 49, 54

*Penn Central Transportation Co. v. City of New York*,
438 U.S. 104 (1978)...........................................................................*passim*

*Penn. Coal Co. v. Mahon*,
260 U.S. 393 (1922)..........................................................................43, 45, 51

*Pennell v. City of San Jose*,
485 U.S. 1 (1988)...................................................................................45, 54

*Planned Parenthood of Se. Pa. v. Casey*,
505 U.S. 833 (1992)....................................................................................53

*Preseault v. ICC*,
494 U.S. 1 (1990)........................................................................................56

*Pultz v. Economakis*,
10 N.Y. 3d 542 (2008) ...............................................................................6, 30

*Reno v. Flores*,
507 U.S. 292 (1993)....................................................................................56

*Romer v. Evans*,
517 U.S. 620 (1996) ........ 55

*Santiago-Monteverde v. Pereira*,
24 N.Y.3d 283 (2014) ........ 19, 42

*Seawall Assocs. v. City of New York*,
74 N.Y.2d 92 (1989) ........ 27

*SM Kids, LLC v. Google LLC*,
963 F.3d 206 (2d Cir. 2020) ........ 20

*St. Joseph Abbey v. Castille*,
712 F.3d 215 (5th Cir. 2013) ........ 55, 56, 57

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) ........ 43, 52

*United States v. Causby*,
328 U.S. 256 (1946) ........ 23, 39, 40

*United States v. Decastro*,
682 F.3d 160 (2d Cir. 2012) ........ 53

*United States v. Salerno*,
481 U.S. 739 (1987) ........ 25

*United States v. Stevens*,
559 U.S. 460 (2010) ........ 25, 53

*Washington v. Barr*,
925 F.3d 109 (2d Cir. 2019) ........ 21

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ........ 55

*West 95 Housing Corp. v. N.Y.C. Department of Housing Preservation and Development*,
31 F. App'x 19 (2d Cir. 2002) ........ 52

*Winston v. City of Syracuse*,
887 F.3d 553 (2d Cir. 2018) ........ 55

*Wroblewski v. City of Washburn*,
965 F.2d 452 (7th Cir. 1992) ....................................................................57

*Yee v. City of Escondido*,
503 U.S. 519 (1992)...........................................................18, 32, 36, 43

**Statutes and Regulations**

9 N.Y.C.R.R. § 2522.5 ..........................................................................25

9 N.Y.C.R.R. § 2523.5 ..........................................................................26

9 N.Y.C.R.R. § 2524.3 ..........................................................................27

9 N.Y.C.R.R. § 2524.5 ...........................................................33, 34, 35

28 U.S.C. § 1291 ......................................................................................4

28 U.S.C. § 1331 ......................................................................................3

Emergency Tenant Protection Act of 1974.........................................5, 6

Housing Stability and Tenant Protection Act of 2019....................*passim*

N.Y. Unconsol. Law § 8603 ..............................................................6, 14

N.Y. Unconsol. Law § 8622 ..................................................3, 6, 29, 50

N.Y. Unconsol. Law § 8623 ........................................................6, 14, 25

N.Y.C. Admin. Code § 26-504 ..................................................................5

N.Y.C. Admin. Code § 26-504.1 ........................................................7, 9

N.Y.C. Admin. Code. § 26-504.2 ...............................................................7

N.Y.C. Admin. Code. § 26-504.3 ...............................................................7

N.Y.C. Admin. Code § 26-511 ..................................................7, 9, 30, 31

**Other Authorities**

Eric Berger, *The Collision of the Takings and State Sovereign Immunity Doctrines*, 63 Wash. & Lee L. Rev. 493 (2006) ...............................60

Federal Rule of Civil Procedure 12(b)(1) ....................................................20

Federal Rule of Civil Procedure 12(b)(6) ........................................2, 17, 21, 57

Note, *Reconciling State Sovereign Immunity with the Fourteenth Amendment*, 129 Harv. L. Rev. 1068 (2016) ....................................................60

Press Release, New York State Senate Democratic Majority, Senate Majority Passes Strongest Tenant Protections in State History (June 14, 2019) ....................................................8

U.S. Const. Amend. V ....................................................55

## INTRODUCTION

In June 2019, New York State amended the Rent Stabilization Law ("RSL"), a collection of state and local laws that govern rental of nearly one million apartments in New York City. As amended, the RSL does far more than regulate rents. It strips owners of their rights to use, possess, and exclude others from their property—including by forcing owners to continue renting to current tenants and their chosen successors indefinitely, barring owners from using their apartments as personal residences or housing for family members, and making it impossible for owners to use their property for purposes other than rent-stabilized housing. As a whole, the amended RSL transfers core elements of property ownership from apartment owners to tenants, thus relegating owners to caretakers of housing conscripted into the service of an off-budget public-assistance program. The amended RSL likewise annihilates owners' investment-backed expectations by making it impossible to recover capital investments and locking in below-market rents in perpetuity.

These extreme restrictions on property rights are purportedly necessary to remedy the "public emergency" of limited affordable housing. The sole criterion to establish that emergency—and thus the necessary condition for application of the RSL's restrictions—is a residential vacancy rate that does not exceed 5%. But the vacancy rate for non-stabilized units exceeds that threshold, and the overall vacancy

rate is below it only because vacancies in stabilized units are so rare. In plain English, the RSL causes the very "emergency" that it is purportedly designed to address.

Plaintiffs own rent-stabilized apartments in New York City and have long operated under the RSL without challenging its constitutionality. They brought this action challenging the constitutionality of the RSL as amended in 2019 because, among other things, it effects a taking of their property without just compensation and violates their due process rights.

The District Court dismissed Plaintiffs' takings claims, relying largely on non-precedential decisions upholding prior versions of the RSL, even though the amended RSL differs fundamentally from its predecessors. The court held that Plaintiffs could not plead physical-takings claims because they still retained title to their property and could choose to sell it. That holding conflicts with Supreme Court decisions finding physical takings even when property owners retained those rights. On Plaintiffs' regulatory-takings claims, the District Court held that parties who purchased property after the RSL's enactment cannot challenge later versions of the law, because they knew the law could be amended. That holding also conflicts with Supreme Court precedent and would lead to the staggering implication that the RSL can *never* cause a regulatory taking of Plaintiffs' property regardless of its effects.

The District Court improperly bypassed Rule 12(b)(6)'s liberal pleading standard in dismissing Plaintiffs' due process claims. The court held that those

claims are subject to rational-basis review and fail under that standard because the court must defer to the legislature's judgment. That holding disregards the important role that the courts must play in protecting constitutional rights, even under rational-basis review. Courts may defer only to *rational* legislative judgments, and a plaintiff is entitled to present evidence and prove that the legislature's judgment fails that test. Plaintiffs' specific allegations that the RSL is self-defeating because it perpetuates the emergency it is supposed to resolve are sufficient to state a claim and allow the claim to proceed to discovery.

As originally enacted, the RSL was intended to facilitate a "transition from regulation to a normal market of free bargaining between landlord and tenant." N.Y. Unconsol. Law § 8622. But the amended RSL no longer serves that objective. As the sponsors of the 2019 Amendments proclaimed, the statute's new focus is ensuring that that rent-stabilized apartments remain stabilized in perpetuity. This Court should make no mistake: the amended RSL burdens owners' property rights in ways that no court has ever addressed, much less upheld. This Court should reverse the District Court's judgment and remand to provide Plaintiffs an opportunity to develop a record in support of their challenges to the amended RSL's unprecedented scheme.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction over Plaintiffs' constitutional challenges under 28 U.S.C. § 1331. It entered final judgment on February 12,

2021, and an amended judgment on March 5, 2021. Joint Appendix ("JA") 304, 312-13. Plaintiffs timely filed notices of appeal regarding both judgments. JA309, JA314. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in dismissing Plaintiffs' claims that the RSL effects a physical taking, both on its face and as-applied.

2. Whether the District Court erred in dismissing Plaintiffs' claims that the RSL effects a regulatory taking, both on its face and as-applied.

3. Whether the District Court erred in dismissing Plaintiffs' claim that the RSL violates the Fourteenth Amendment's Due Process Clause.

4. Whether the District Court erred in concluding that sovereign immunity bars Plaintiffs' claims against the State of New York, the Division of Housing and Community Renewal ("DHCR"), and DHCR Commissioner RuthAnne Visnauskas.

## STATEMENT OF THE CASE

### A. New York's Rent Stabilization Law

#### *1. Rent Stabilization Before 2019*

The RSL's origins date to the New York City Rent Stabilization Law of 1969. JA37.[1] That law limited the rents that property owners could charge for certain designated apartments and created the Rent Guidelines Board to regulate rent adjustments for stabilized units going forward. *Id.* But because the City Council recognized that imposing "rent controls" could cause a housing shortage by "discouraging … new construction," the law "permit[ted] a great deal of freedom for property owners to increase rents within reasonable limits and thus to enjoy quite profitable operations of their properties." *8200 Realty Corp. v. Lindsay*, 27 N.Y.2d 124, 136-37 (1970).

Five years later, the State of New York enacted the Emergency Tenant Protection Act of 1974 ("ETPA"). JA38. The ETPA amended the RSL by, among other things, extending rent stabilization to all buildings containing six or more units that were constructed before 1974 and no longer subject to rent control. N.Y.C. Admin.

[1] New York's rent-stabilization laws are codified in Title 23 of the Unconsolidated Laws of New York and Title 26 of the New York City Code. Additional regulations issued under the Emergency Tenant Protection Act of 1974 are published in Chapter 249-B of the Unconsolidated Laws of New York and Title 9 of the New York Codes, Rules and Regulations. Parts M and N of the 2019 amendments to the RSL revise other laws regarding the procedures for evicting tenants who breach their lease agreements and for converting apartments to condominiums and co-ops. Throughout this Brief, Plaintiffs refer to these laws collectively as the "Rent Stabilization Law" or the "RSL."

Code § 26-504(a)(1). It also permitted municipalities to trigger the application of rent stabilization by declaring a housing emergency if vacancy rates fell below 5% and additional criteria were satisfied. N.Y. Unconsol. Law § 8623. Like the City Council, the State Legislature struck a balance between rent regulation and market forces. The ETPA thus declared that one of the law's "ultimate objective[s]" is to facilitate a "transition from regulation to a normal market of free bargaining between landlord and tenant." N.Y. Unconsol. Law § 8622. To that end, the ETPA added to the RSL sunset provisions, which required the State Legislature to periodically reevaluate whether rent stabilization remains necessary. JA40. It also required municipalities to reconsider every three years whether a housing emergency requiring rent regulation persisted, N.Y. Unconsol. Law § 8603, and included provisions allowing property owners to reclaim rent-stabilized apartments for their own use as a primary residence, or as residences for family members, *see Pultz v. Economakis*, 10 N.Y. 3d 542, 548 (2008).

Changes to the RSL over the following decades struck a similar balance. For example, amendments allowed property owners to increase rents up to 20% after units became vacant, thus allowing stabilized rents to catch up—at least partly—with market-rate rents when a unit turned over. Other changes allowed rents to be increased to fully recapture costs of major capital improvements ("MCIs"), which benefit all of a building's tenants (like replacing a roof), and individual apartment

improvements ("IAIs") (such as kitchen renovations). N.Y.C. Admin. Code § 26-511-c(5-a) (repealed June 14, 2019); *id.* § 26-511-c(6) (amended June 14, 2019). Moreover, in 1993, the State enacted decontrol provisions, permitting owners to transition rent-stabilized apartments to market-rate rentals once (1) the rent exceeded $2,000 per month (later increased to $2,700 per month, with further increases indexed to annual Rent Guidelines Board lease-renewal adjustments) and (2) either the apartment became vacant or the tenant's income surpassed $250,000 (later reduced to $200,000) in consecutive years. JA39-40; N.Y.C. Admin. Code. §§ 26-504.1, 26-504.2, 26-504.3 (repealed June 14, 2019).

*2. The 2019 Amendments*

On June 14, 2019, Governor Cuomo signed into law the Housing Stability and Tenant Protection Act of 2019 ("HSTPA"), which adopted sweeping changes to the RSL.[2] The law's sponsors candidly described the law's radical aims. One sponsor urged its passage to "ensure that rent-stabilized apartments remained stabilized." JA28-29. Another explained that real property "doesn't truly belong to" those who "have the monetary resources to purchase it and, to put it really bluntly … take it away from … the collective." JA31. Other sponsors acknowledged that the 2019

[2] Technical corrections to the HSTPA were enacted two weeks later. JA27. Plaintiffs refer to the HSTPA and these corrections together as the "2019 Amendments."

Amendments were a departure from the past and created "the strongest tenant protections in history." JA32.

These statements were not mere rhetoric: The 2019 Amendments fundamentally changed the RSL, marking a sharp break from the balanced regime that had been in place for the preceding half century.

*First*, the 2019 Amendments repealed the RSL's sunset provision, turning the RSL, as one sponsor boasted, into a form of "permanent rent regulation." [3]

*Second*, the 2019 Amendments curtailed—and in most instances eliminated altogether—property owners' right to reclaim rent-stabilized apartments for use as a primary residence. Before the 2019 Amendments, owners could reclaim multiple apartments—up to and including all rent-stabilized apartments in a building—as primary residences for themselves or their family. JA42. Under the 2019 Amendments, however, owners may reclaim only a single unit for personal or family use, regardless of how many units they own. *Id.* As to all other units they own, the law bars owners from exercising the possessory interest in their property. JA46-53.

Moreover, recovering even that one unit is nearly impossible in practice. Owners must demonstrate to the State's satisfaction that they or a family member

[3] Press Release, New York State Senate Democratic Majority, Senate Majority Passes Strongest Tenant Protections in State History, (June 14, 2019) https://www.nysenate.gov/sites/default/files/press-release/attachment/06.14.19_housing_rent_regs_passing_release_0.pdf.

have an "immediate and compelling necessity" to use the unit as a primary residence, JA49; N.Y. Reg. Sess. § 6458, Part I (2019), a standard that has been interpreted in the rent-control context as "verging upon stark necessity," *Hammond v. Marcely*, 58 N.Y.S. 2d 565, 565 (Mun. Ct. 1945). As a result, owners must obtain the Government's permission to live in one of their own rent-stabilized apartments. And even then, the owner cannot reclaim possession from a senior, disabled, or long-term tenant without first finding equivalent housing for the tenant "at the same or lower stabilized rent in a closely proximate area." N.Y.C. Admin. Code § 26-511(c)(9)(b).

*Third*, the 2019 Amendments revoked the RSL's decontrol provisions, which allowed owners to deregulate units with monthly rents exceeding a prescribed threshold ($2,774.76 in 2019) that either (1) became vacant or (2) had tenants whose income exceeded $200,000 in consecutive years. JA43, 69-72; *see* N.Y.C. Admin. Code §§ 26-504.1 to .3 (repealed June 14, 2019).

*Fourth*, the 2019 Amendments enacted severe cuts to the rent adjustments owners may make to recoup the costs of capital investments in their rent-stabilized apartments (*i.e.*, MCIs and IAIs). JA44, 77-84. For example, the amended RSL caps at $15,000 the amount of IAIs that can be factored into an apartment's rent over a 15-year period, regardless of the actual cost of improvements or whether the improvements are necessary to comply with building codes. JA77. The RSL also lengthens the period over which owners may recover IAI investments, with the result

that owners (1) can recover only a miniscule amount of the investment each month and (2) cannot recover the full costs of the improvements. JA77-83.

*Fifth*, the 2019 Amendments repealed the RSL's provisions allowing rents to be increased after a vacancy, impairing owners' ability to earn reasonable returns on their investments. JA43-44, 67-69. These provisions were particularly important for property owners given the lengthy duration of rent-stabilized tenancies—a dynamic that causes stabilized rents, which are subject to stringent limitations on annual increases, to fall ever further behind market-rate rents. JA68-69 (stabilized apartments in the Panagouliases' building rent for roughly *half* of what comparable market-rate units rent for in the same building).

Before the 2019 Amendments, the RSL's decontrol provisions, in tandem with the provisions allowing recovery of capital investments and vacancy-based rent increases, provided a pathway for owners of rent-stabilized housing to regain control of their property. JA69-72. Owners who invested in their apartments could eventually deregulate them—and thus put them to uses other than rent-stabilized housing—once the apartments became vacant or the tenants failed the RSL's means-testing requirements. *Id.* Repeal of the decontrol provisions thus cut off the primary means by which owners could regain their ability to possess, use, and exclude others from their property—effectively ensuring that rent-stabilized apartments will remain stabilized in perpetuity. JA43, 70. The 2019 Amendments compounded that harm by

imposing additional structural constraints—such as dramatically reduced recovery of capital-improvement costs and elimination of vacancy-based rent increases—that collectively drive stabilized rents even further below market rates and hinder owners' ability to cover the substantial costs of maintaining the aging, pre-1974 buildings governed by the RSL. JA66-69, 78, 83.

*Sixth*, the 2019 Amendments rewrote the terms of existing leases, further reducing the maximum level of permissible rents. Before the 2019 Amendments, the RSL permitted owners to offer "preferential" rents below an apartment's legal regulated rent, while reserving the right to charge higher rates in subsequent lease terms. JA45. The 2019 Amendments lock in all preferential rents for the duration of a tenancy, even when the prior leases expressly stated that the preferential rent was a one-time concession. JA72-77.

*Seventh*, the 2019 Amendments stripped owners of their ability to determine whether to convert rent-stabilized apartments into condominiums or co-ops. Before the 2019 Amendments, property owners could convert regulated apartments into unregulated co-ops or condominiums through (1) "non-eviction plans," in which owners had to obtain 15-percent buy-in from purchasers (including non-tenants), and tenants who did not choose to convert could remain in their units, or (2) "eviction plans," in which regulated apartments would be converted with 51% tenant buy-in and remaining tenants subject to eviction after three years. JA45-46. Under the

2019 Amendments, however, eviction plans have been eliminated entirely, and non-eviction plans—*i.e.*, plans that allow tenants to stay in their units no matter what—must be approved by a *majority* of tenants. JA45-46, 84-85. Accordingly, tenants, not owners, now control whether a building may be converted to condominiums or a co-op, even when that conversion has no bearing on the tenants' ability to stay in their units or the rents they will pay.

*3. The RSL's Self-Defeating Economics*

The RSL causes the problem it was enacted to solve. The law purports to increase the supply of available affordable housing. But it has the opposite effect, as it both reduces the quality and quantity of housing and decreases affordability. As economist Paul Krugman has observed, "rent control," "among the best-understood" and "least controversial" "issues in all of economics," "[p]redictabl[y]" causes both "[s]ky-high rents on uncontrolled apartments, because desperate renters have nowhere to go" and "the absence of new apartment construction, despite those high rents, because [property owners] fear that controls will be extended." JA292. Additional studies reiterate that rent regulations limit the supply of rental housing, drive up rents, and decrease the quality (while increasing the cost) of unregulated properties. JA89-91.

New York's experience follows the general course. Economists have determined that rent regulation in New York City leads to a significant misallocation of

apartments—meaning roughly 20% of tenants live in either larger or smaller units than they would without rent control and stabilization. JA92-93. This misallocation of property harms New Yorkers to the tune of hundreds of millions of dollars a year. *Id.* Studies have also consistently shown that New York's rent regulation scheme causes unregulated units to carry substantially higher rents than they would otherwise. JA93. In turn, these higher rents hurt tenants of rent-regulated units, as without the scheme they would "face[] lower price[s] [for] housing in the uncontrolled sector and" could "find units in the free sector that better fit their needs." *Id.* In simplest terms, economists agree that "tenants in rent stabilized … units would be better off if controls had never been established." *Id.*

That is especially true now that the 2019 Amendments have eliminated any means testing. Even before the 2019 Amendments, nearly 28,000 New Yorkers earning more than $200,000 per year lived in rent-stabilized apartments. JA97-98. These high-income tenants were the law's biggest beneficiaries, as they received much greater discounts from the market rates of their apartments than did less wealthy New Yorkers. In 2017, for example, renters with income in the top quarter of New York households received discounts of 39% on average, while renters in the bottom quarter of incomes received discounts of 15%. JA97. The 2019 Amendments will only deepen this disparity. Moreover, by eliminating owners' ability to recover the full cost of improvements to their properties, the 2019 Amendments will

"exacerbate the comparatively poorer condition of rent stabilized units," which "report 80 percent more maintenance deficiencies on average than market-rate units." JA99-100, *see also* JA82-83.

The RSL also causes the housing "emergency" that rent stabilization purportedly is intended to remedy. Under the law, rent stabilization applies when a locality determines "[t]he existence of [a] public emergency requiring the regulation of residential rents," and that determination is permitted only if the local vacancy rate does not exceed 5%. N.Y. Unconsol. Law § 8623(a).

A locality must revisit its past emergency declarations and conduct a survey recalculating its vacancy rate every three years. N.Y. Unconsol. Law § 8603. In New York City's 2017 survey—the most recent available—the vacancy rate in non-stabilized apartments was 6.07%, above the emergency threshold. JA41. The vacancy rate in rent-stabilized units, however, was a mere 2.06%, causing the City's overall vacancy rate to fall to 3.63%. Thus, the RSL itself causes the statutory threshold for an "emergency" warranting rent stabilization to be met. *Id.*

Finally, the RSL substantially reduces the value of rent-stabilized apartments. Among other things, the RSL restricts rent increases to levels prescribed by the Rent Guidelines Board, JA66, and those authorized increases have not kept pace with inflation in the costs of operating apartments, as illustrated in the chart below (JA67):




Before the 2019 Amendments, this dynamic and other elements of the RSL's scheme caused rent-stabilized apartments to be worth approximately half as much as comparable unregulated apartments. JA107. The additional burdens imposed by the 2019 Amendments have caused rent-stabilized apartments to lose an additional 20-40% or more of their value relative to market-rate units. *Id.* These effects are so severe that they have jeopardized property owners' ability to refinance their mortgages in the future. JA69, 108.

### B. Procedural History

Plaintiffs own apartment buildings in New York City that are subject to the RSL. Plaintiffs Dimos and Vasiliki Panagoulias own a building in Long Island City, which they purchased in 1974 after immigrating from Greece. JA32-33. The building is 89 years old and contains 10 apartments, 6 of which are governed by the RSL.

*Id.* The Panagouliases raised their family, including their son, Plaintiff Dino Panagoulias, in the building, and today Dino and his family live in the building, which he manages in his spare time. *Id*. Plaintiff Eighty Mulberry Realty Corporation is a family-owned company that purchased an apartment building in the Chinatown neighborhood of Manhattan in approximately 1950 and has owned the building ever since. JA34. The building contains 33 units, 15 of which are governed by the RSL. *Id.* Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, and 177 Wadsworth LLC purchased apartment buildings in the Washington Heights neighborhood of Manhattan in the 2000s and have owned the buildings since then. JA33. These buildings contain between 14 and 27 units each, all of which are governed by the RSL. *Id.*

Plaintiffs filed this action in November 2019, asserting constitutional challenges to the RSL as amended in 2019. These challenges included claims that the law effects a physical taking, both on its face and as applied to Plaintiffs; inflicts a regulatory taking, both on its face and as applied to Plaintiffs; and violates the Fourteenth Amendment's Due Process Clause.[4] The Complaint named as Defendants the State of New York, the DHCR, and DHCR Commissioner Visnauskas; and the City

[4] Plaintiffs also asserted claims under the Contracts Clause, but do not raise those claims on appeal. All counts of the Complaint were asserted on behalf of all Plaintiffs, except that 177 Wadsworth did not assert as-applied takings claims.

of New York, the New York City Rent Guidelines Board, and various Rent Guidelines Board members. The District Court designated this case as related to *Community Housing Improvement Program v. City of New York*, No. 1:19-cv-4087 ("*CHIP*"), which raises overlapping constitutional challenges to the RSL, and which is now pending before this Court in No. 20-3366. In December 2019, three tenant groups sought and were granted leave to intervene as Defendants. JA14.

Defendants and Intervenor-Defendants moved to dismiss the complaint for failure to state a claim, and the State defendants filed a supplemental motion to dismiss for lack of subject-matter jurisdiction.

On September 30, 2020, the District Court issued a single opinion deciding the motions to dismiss in this case and the *CHIP* case due to their "significantly overlapping claims and issues of law." SA2. The District Court dismissed the *CHIP* plaintiffs' claims in their entirety, and dismissed all of the *74 Pinehurst* plaintiffs' claims except for the as-applied regulatory-takings claims brought by Eighty Mulberry and the Panagouliases. SA1-40. Specifically, the District Court concluded that Plaintiffs' claims against the State and the DHCR were barred by sovereign immunity, while the claims against the other Defendants failed to state a claim under Rule 12(b)(6).

Eighty Mulberry and the Panagoulias Plaintiffs dismissed with prejudice their surviving claims on February 5, 2021. JA301-03. The District Court entered judgment in favor of some of the Defendants on February 12, 2021, JA304, and issued an amended judgment in favor of all Defendants on March 5, 2021. JA312-13. Plaintiffs timely filed notices of appeal with respect to both judgments. JA309, JA314. This Court has consolidated the appeals from those judgments.

## SUMMARY OF ARGUMENT

**I.** The District Court erred in dismissing Plaintiffs' physical-takings claims. By depriving owners, including Plaintiffs, of core property rights in rent-stabilized apartments—including the rights to use, possess, and exclude others from their property—the amended RSL results in a physical occupation, and thus a physical taking of regulated apartments. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). Although the Supreme Court has sustained rent-control ordinances, it has cautioned that "[a] different case would be presented were [a] statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Yee v. City of Escondido*, 503 U.S. 519, 528 (1992). Dismissal was improper because Plaintiffs have plausibly alleged that this is that "different case."

The District Court held that Plaintiffs could not state physical-takings claims because they retain title to and the ability to sell their properties. But that confuses

ownership and transferability of title with the rights to possess and exclude: under *Loretto* (among other cases), an indefinite physical occupation of property is a physical taking regardless of whether the owner retains title. Because Plaintiffs plausibly alleged that the amended RSL's provisions, when considered as a whole, result in a nonconsensual, long-term physical occupation of their property, the District Court erred in dismissing their physical-takings claims.

**II.** The amended RSL also "goes so far beyond ordinary regulation," *Kaiser Aetna v. United States*, 444 U.S. 164, 178 (1979), as to constitute a regulatory taking of rent-stabilized apartments, including Plaintiffs' properties. Under the flexible test for regulatory takings, *see Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), the amended RSL works such a taking because it (1) causes significant economic harm to owners of rent-stabilized properties; (2) interferes with owners' investment-backed expectations; and (3) is of a character that imposes a severe burden on owners of rent-stabilized housing, insofar as it requires them to "bear public burdens" that "should be borne by the public as a whole." *Id.* at 123 (cleaned up). Indeed, New York's highest court has acknowledged that the RSL provides "a public assistance benefit" "*conferred by* the government" but "*paid for*" by regulated "private owners of real property." *Santiago-Monteverde v. Pereira*, 24 N.Y.3d 283, 291 (2014) (emphases in original).

In dismissing Plaintiffs' as-applied claims, the District Court erred in holding that the existence of a milder version of the RSL when Plaintiffs purchased their properties precluded them from challenging the confiscatory 2019 Amendments. And in dismissing Plaintiffs' facial *Penn Central* claims, the court erroneously viewed such claims as virtually impossible to plead, which necessarily influenced its view that Plaintiffs had not stated a claim.

**III.** The District Court improperly dismissed Plaintiffs' due process claim, conducting rational-basis review rather than applying the heightened scrutiny the RSL warrants. Regardless, dismissal was improper even under rational-basis review because Plaintiffs have plausibly alleged that the RSL irrationally causes the very problem—the depressed rate of housing availability—that the legislature has designated as a necessary criterion for stabilization to apply.

**IV.** The District Court's determination that sovereign immunity bars the claims brought against the State defendants was also error. The Takings Clause is "self-executing," *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 315 (1987) (cleaned up), and therefore provides a compensation remedy without regard to Defendants' sovereign immunity.

## STANDARD OF REVIEW

This Court reviews *de novo* orders dismissing an action for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), *SM Kids,*

*LLC v. Google LLC*, 963 F.3d 206, 210-11 (2d Cir. 2020), and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), *Washington v. Barr*, 925 F.3d 109, 113 (2d Cir. 2019). To survive a motion to dismiss under Rule 12(b)(6), a party need only plead "sufficient factual matter, accepted as true, to state a claim [for] relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Leibowitz v. Cornell Univ.*, 445 F.3d 586, 590 (2d Cir. 2006).

## ARGUMENT

### I. Plaintiffs Plausibly Allege Physical-Takings Claims.

Plaintiffs have plausibly alleged that the amended RSL, on its face and as applied to them, violates the Takings Clause by authorizing the physical occupation of rent-stabilized housing by third parties. The RSL does not simply regulate the rent that owners may charge when leasing their apartments. Instead, it requires the owners to continue renting those apartments to current tenants in perpetuity, allows tenants to transfer those possessory rights to third parties without owners' consent, and prevents owners from using their properties for anything but rent-stabilized rental housing. If merely requiring apartment owners to allow installation of cable-television wiring on their buildings is enough to constitute a physical taking, *see Loretto*, 458 U.S. at 421, then there is little question that the amended RSL—which

imposes far more on owners' constitutionally-protected property rights—effects a physical taking, too.

### A. A Physical Taking Occurs When the Government Authorizes a Person to Occupy Another's Property.

*Loretto* instructs that government-authorized occupation of another's property results in a *per se* taking. *See id.* at 438-40. *Loretto* involved a challenge to a New York law that authorized cable companies to install wiring and equipment on apartment buildings without the owners' consent. *See id.* at 421-23. Although the law in question "serve[d] legitimate public purpose[s]," those purposes were irrelevant to the takings analysis, which focused instead on whether the law resulted in a nonconsensual physical occupation of the properties. *Id.* at 425; *see id.* at 434-35.

As the Supreme Court observed, "physical intrusion by the government [is] a property restriction of an unusually serious character." *Id.* at 426. Long-term physical occupation posed especially serious constitutional difficulties, as it "effectively destroy[ed]" owners' rights "to possess, to use, and to dispose of" the occupied property, including by denying owners "the power to exclude the occupier from possession and use of the space," a right "traditionally considered [] one of the most treasured strands in an owner's bundle of property rights." *Id.* at 435. That the law in question authorized an occupation by a third party supported the conclusion that the law worked a taking, as "an owner suffers a special kind of injury when a

*stranger* directly invades and occupies the owner's property." *Id.* at 436. Accordingly, the New York law effected a physical taking by "authoriz[ing] the permanent occupation of the landlord's property by a third party." *Id.* at 440; *see also Cablevision Sys. Corp. v. FCC*, 570 F.3d 83, 98 (2d Cir. 2009) ("required acquiescence to the occupation of [a] property by an uninvited stranger or an interloper with a government license" is a *per se* taking).

The Supreme Court referred to the "physical occupation" in *Loretto* as "permanent," but a plaintiff need not allege a permanent deprivation of its property rights to state a claim under the Takings Clause. "In the context of physical takings 'permanent' does not mean forever, or anything like it." *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1357 (Fed. Cir. 2006) (citation omitted) (distinguishing "substantial" from "transient and relatively inconsequential incursion[s]"); *see also First English*, 482 U.S. at 318 ("Nothing in the Just Compensation Clause suggests that 'takings' must be permanent and irrevocable."). In *United States v. Causby*, 328 U.S. 256 (1946), for example, the Court found a taking where military airplanes frequently flew at low altitude over the respondent's land. The fact that these flights occurred only a small percentage of the time, and that the military had only leased the nearby airfield for a limited period, did not stand in the way of that conclusion. *Id.* at 258-61; *see also Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825,

832 (1987) (beach-access easement over plaintiffs' private property caused "permanent physical occupation" where individuals were "given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises."). Even in *Loretto*, placement of the cable boxes was "far from permanent," requiring only that the equipment remain installed "[s]o long as the property remains residential and a [cable-television] company wishes to retain the installation." 458 U.S. at 448 (Blackmun, J., dissenting).

The "determination of whether government occupancy is 'permanent' is highly fact-specific," *Cablevision*, 570 F.3d at 98, and is therefore not well-suited to adjudication on a motion to dismiss.

### B. Plaintiffs Plausibly Allege Facial Physical-Takings Claims.

The Complaint states a facial physical-takings claim because it plausibly alleges that the combined effect of the RSL's unprecedented burdens on owners' rights to possess, use, and exclude results in a nonconsensual physical occupation of rent-stabilized housing. The RSL grants tenants and their successors the right to occupy rent-stabilized apartments in perpetuity and without the property owner's approval. These provisions strip owners of the right to exclude and permit strangers with whom an owner has no prior dealings to occupy the owner's property. The RSL exacerbates that intrusion by depriving owners of the ability to live in their own

apartments or set them aside for use by family and relatives. Because these allegations are sufficient to demonstrate that the amended RSL "lacks any plainly legitimate sweep," *United States v. Stevens*, 559 U.S. 460, 472 (2010), they adequately allege facial physical-takings claims.[5]

*1. The Amended RSL Deprives Owners of the Right to Exclude Others from Their Property.*

Plaintiffs plausibly allege that several provisions of the amended RSL together strip owners of the right to exclude others from their property.

***Perpetual renewal rights***: Plaintiffs allege that the RSL "effects a physical taking by requiring property owners, including Plaintiffs, to continually offer renewal leases." JA103; *see also* JA54-58. The RSL gives rent-stabilized tenants the right to renew their leases for one or two years on the same terms and at no more than the government-approved rate, regardless of whether the property owners would consent to renewing those tenants' leases—or indeed, whether the owners wish to rent out their properties at all. *See* N.Y. Unconsol. Law § 8623; 9

[5] Defendants argued that Plaintiffs must allege that there is "no set of circumstances" under which the RSL would not effect a physical taking, *United States v. Salerno*, 481 U.S. 739, 745 (1987), but the District Court correctly declined to apply that test. *See* Part II.B, *infra*.

N.Y.C.R.R. § 2522.5(b). This renewal right has no endpoint and routinely results in tenancies that span decades. *See, e.g.*, JA58.

***Broad successorship rights***: Plaintiffs also allege that owners are deprived of their right to exclude because the RSL allows tenants to convey their tenancy rights, without the owner's consent, to a broad range of third parties with whom the owner has no prior dealings. JA54-55; 9 N.Y.C.R.R. § 2523.5(b)(1). Successors who may take over the right to lease rent-stabilized apartments include "any member" of the "tenant's family" who has lived in the apartment for at least two years (or one year, for senior citizens and disabled persons). JA54-55; 9 N.Y.C.R.R. § 2523.5(b)(1). The RSL defines "family" for this purpose to include not only relatives by blood or marriage, *id.* § 2520.6(*o*)(1), but also "[a]ny other person residing with the tenant ... who can prove emotional and financial commitment, and interdependence between such person and the tenant" using a non-exclusive eight-factor test, *id.* § 2520.6(*o*)(2). Given the breadth of that definition, countless third parties qualify as successors to rent-stabilized tenants, including persons who share a "deep friendship" with the tenant of record. *6914 Ridge Blvd., LLC v. Delao*, No. 86571/18, 2020 NYLJ LEXIS 182 at *1-2 (Civ. Ct. Kings Cty. Jan. 28, 2020). And these successors are entitled to pass successorship rights to *their* successors (and so on). By forcing owners to rent their apartments to strangers "with whom they have

no existing landlord-tenant relationship," the RSL "deprives the owners of their possessory interests and results in a physical taking." *Seawall Assocs. v. City of New York*, 74 N.Y.2d 92, 106 (1989).

***Byzantine eviction procedures*:** The amended RSL puts tenants, rather than property owners, in control of when a tenancy ends even after a tenant breaches the lease agreement. JA57, 84-85. Under the RSL, owners may terminate leases only in narrow circumstances, such as failure to pay rent or use of the apartment for unlawful purposes. *See* 9 N.Y.C.R.R. § 2524.3. But even in these circumstances, the RSL permits a tenant to remain in the apartment for up to a year *after* a court determines that the tenant breached the lease. *See* N.Y. Real Prop. Acts § 753. Once a warrant of eviction is issued, the tenant may still retain control of the apartment by making payment before the warrant is executed. *See id.* § 749. And even after a warrant is served, it applies only to the occupant(s) named in the warrant, forcing an owner to return to court to obtain new warrants if someone other than the lawful tenant (*e.g.*, a friend or relative) is also occupying the apartment. JA84. In conjunction with the renewal and succession rights discussed above, these provisions eviscerate owners' ability to exclude others from their property and force owners to

provide rent-free housing to individuals with whom they no longer have a contractual relationship (or in the case of unauthorized tenants, never had a relationship at all).

For these reasons, the RSL burdens property owners far more (and certainly no less) than the statute in *Loretto*. There, the Supreme Court focused on the "special kind of injury [inflicted] when a *stranger* directly invades and occupies the owner's property"—harm that "is qualitatively more severe than a regulation of the *use* of property" because "the owner may have no control over the timing, extent, or nature of the invasion." 458 U.S. at 436 (emphases in original). Taking Plaintiffs' well-pleaded allegations as true, tenancies under the RSL meet all of those criteria. JA46-64, 69-72, 84-85. Because the RSL provides no endpoint for this transfer of rights, it is just as permanent as the open-ended wiring intrusion addressed in *Loretto*. *See* 458 U.S. at 439 & n.17. Indeed, the net effect of the provisions described above is to transfer wholesale the right to exclude, "one of the most treasured strands in an owner's bundle of property rights," *id.* at 435, from the property owner to the tenant and his or her successors. That right "falls within th[e] category of interests that the Government cannot take without compensation." *Kaiser Aetna*, 444 U.S. at 180.

#### 2. *The Amended RSL Deprives Owners of the Rights to Use and Possess Their Property.*

Plaintiffs also plausibly allege that the RSL effects a physical taking by diminishing property owners' ability to use and possess their regulated apartments to

the point that those rights no longer exist in practice. This invasion of core property rights results from the combined effect of several parts of the RSL, including new restrictions imposed by the 2019 Amendments. That effect was not accidental. To the contrary, the amendments were touted as "ensur[ing] that rent stabilized apartments remain rent stabilized" and "protect[ing]" the City's "regulated housing stock." JA59.

***Elimination of decontrol off-ramps***: Consistent with the RSL's purpose of "transition[ing] from regulation to a normal market of free bargaining between landlord and tenant," N.Y. Unconsol. Law § 8622, the law previously allowed owners to deregulate stabilized apartments if their rent exceeded a prescribed threshold and (1) the unit became vacant or (2) the tenants' income exceeded the RSL's means-testing criteria in consecutive years. JA69-70. These decontrol provisions worked together with the RSL's other provisions—including those allowing owners to factor the cost of capital improvements (IAIs and MCIs) into monthly rents and permitting "catch-up" rent increases between tenancies, JA43-44—to provide a pathway for owners to regain control of their property. JA69-72. Owners who invested in their apartments (thus improving the quality of the housing stock) could, over time, put rent-stabilized apartments to other uses such as personal residences, housing for family members, or rental apartments unencumbered by the RSL's renewal, successorship, and other requirements. JA39-40, 69-72. The 2019 Amendments eliminated this off-ramp

from rent stabilization by repealing the decontrol provisions (including means-testing of any kind)—a step that, as a practical matter, dictates that rent-stabilized housing will forever remain stabilized. JA43, 70.

***Inability to reclaim apartments for personal and family use*:** Before the 2019 Amendments, the RSL permitted owners to reclaim multiple apartments—up to and including all rent-stabilized apartments in a building—so long as they or their immediate family members intended in good faith to occupy the units as primary residences. *See Pultz*, 10 N.Y.3d at 548; N.Y.C. Admin. Code § 26-511(c)(9)(b). By contrast, the amended RSL now limits individual owners to recovering a single unit. As to all of the owner's other regulated apartments, the RSL as amended strips the owner of the right of possession. JA46-53.

Moreover, the RSL imposes significant hurdles to property owners' ability to recapture even that solitary unit. Individuals who own rent-stabilized apartments through corporations or other business entities—as is common—cannot reclaim even a single apartment for personal use. JA46-47. And for an individual owner to convert a single unit for personal use, he or she must show "immediate [and] compelling necessity" to use the apartment as a primary residence—a standard courts have interpreted as "verging upon stark necessity." *Hammond v. Marcely*, 58 N.Y.S.2d 565 (Mun. Ct. 1945); *see also, e.g.*, *Buhagiar v. DHCR*, 138 A.D.2d 226, 227 (1st Dep't 1988) (affirming finding of no immediate and compelling necessity

for owner, who shared a five-room, fifth-floor walkup with her daughter, and suffered from chronic knee condition and hypertension, to reclaim larger apartment on lower floor). Even when an owner clears that hurdle, the owner cannot reclaim possession from a senior, disabled, or long-term tenant without offering the tenant equivalent housing "at the same or lower stabilized rent in a closely proximate area." N.Y.C. Admin. Code § 26-511(c)(9)(b). In light of the low vacancy rate for rent-stabilized housing, that requirement poses a significant additional obstacle to reclamation for personal use.

These restrictions mean that (1) most owners cannot occupy their own rent-stabilized apartments, (2) the handful of owners that are eligible may occupy their apartments only if the Government agrees the owner has a compelling need to do so, and (3) any owner who manages to reclaim a rent-stabilized apartment for personal use is prohibited by law from reclaiming all other units for that purpose. As to those units, tenants' "family" members (broadly defined to extend beyond relatives by blood or marriage) have the right to succeed to possession of the unit, but owners' parents or children do not.

Together, these provisions significantly restrict an owner's ability to use and possess stabilized apartments. Plaintiffs have thus adequately alleged that, as in

*Loretto*, "the owner has no right to possess the occupied space himself." 458 U.S. at 435.

### *3.* Yee *Provides Further Support for Plaintiffs' Claims.*

The Supreme Court's decision in *Yee* underscores that the amended RSL effects a physical taking. In *Yee*, the Supreme Court held that a mobile-home rent-control ordinance was not a physical taking because the ordinance regulated trailer park owners' use of their land but did not facially deprive them of their right to exclude. *See* 503 U.S. at 527-29. The owners had voluntarily rented their land to mobile-home owners, and nothing facially "compel[led] [them] ... to continue doing so," because park owners who wished to change the use of their land could evict their tenants with 6 or 12 months' notice. *See id.* at 527-28. The Court cautioned, however, that "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.* at 528.

This is precisely the "different case" that *Yee* envisioned. The amended RSL requires owners to continue renting stabilized apartments indefinitely, to a potentially infinite series of tenants and their successors, regardless of the owners' wishes. And the RSL provides no viable pathway for owners to use their property in any

manner other than as rent-stabilized housing. The RSL thus does far more than simply regulate rent.

Defendants argued in the District Court that the amended RSL does not effect a physical taking because the law provides owners with mechanisms to change the use of their property. Plaintiffs have plausibly alleged facts showing that these pathways are illusory. JA59-64.

***Demolition*:** Defendants point out that owners can remove apartments from rent stabilization by demolishing their buildings. *See* 9 N.Y.C.R.R. § 2524.5(a)(2). But it makes no sense to suggest that an owner can regain lost property rights *by destroying that property*, which would necessarily also eliminate the owner's ability to use and possess the property. *See Loretto*, 458 U.S. at 431 ("intrusion so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it" constitutes a taking). Moreover, to demolish a building, an owner must first (1) pay tenants a $5,000 stipend and reasonable moving costs, and find them new housing "at the same or lower legal regulated rent in a closely proximate area"; (2) find them alternative housing and pay their extra rent for six years, as well as moving costs; or (3) pay a special demolition relocation stipend that often runs into the tens of thousands of dollars per tenant and can range as high as $342,720. JA59-60. In other words, to extricate apartments from rent

stabilization, the owner must not only demolish the building but also pay handsomely for the privilege of doing so.[6]

***Withdrawal from the rental market because of serious safety hazards*:** Nor is the amended RSL's constitutionality salvaged by provisions authorizing apartments to be withdrawn from rent stabilization if (1) the owner withdraws them without any intent to rent or sell all or any part of the land or structure; (2) the building presents a serious safety hazard; and (3) the cost of repairs "would substantially equal or exceed the assessed valuation of the structure." 9 NYCRR § 2524.5(a)(1)(ii). Plaintiffs have plausibly alleged that this provision does not provide a viable off-ramp from rent stabilization because it requires owners to demolish their property—albeit by neglect rather than a wrecking ball. JA63-64. The Takings Clause does not allow the Government to put property owners to an illusory choice between destroying the property or accepting its physical occupation at the Government's behest. Additionally, it is unclear how property owners could avail

[6] This Court's suggestion in *Harmon v. Markus*, 412 F. App'x 420, 422 (2d Cir. 2011), that the RSL did not effect a physical taking because owners could recover possession for the purpose of demolition does not compel a contrary result. *Harmon* is a non-precedential summary order; it did not explain how uncompensated, government-mandated destruction of property is acceptable under the Takings Clause; and it did not recognize that owners had to pay for the privilege of destroying their own property. Regardless, the Supreme Court has since reaffirmed that a law burdening property rights does not cease to be a taking merely "because a landlord could avoid the requirement by ceasing to be a landlord." *Horne v. Dep't. of Agric.*, 576 U.S. 350, 365 (2015).

themselves of this supposed off-ramp from rent-stabilization, given their obligation to keep apartments in habitable condition. *See* N.Y. Real Prop. Acts. § 235-B.

***Use for the owner's business*:** The amended RSL also is not saved by virtue of theoretically permitting an owner to use a rent-stabilized property "in connection with a business he or she owns and operates." 9 N.Y.C.R.R. § 2524.5(a)(1). The Supreme Court has "rejected the argument" that a housing law "[i]s not a taking because a landlord could avoid the [challenged] requirement by ceasing to be a landlord." *Horne*, 576 U.S. at 365.

Regardless, the limits on business use are so extensive as to make business conversion impracticable. The provision does not allow a building to be converted into commercial rental space and applies only if (1) the owner maintains a non-rental business; (2) the regulated apartments are suitable for business use; (3) the apartments are in a building that is zoned for commercial use; and (4) the owners "pay all reasonable moving expenses" of tenants as well as paying "a reasonable stipend and/or ... relocat[ing] the tenant ... to a suitable housing accommodation at the same or lower regulated rent in a closely proximate area" or, if no such housing is available, paying the tenant's extra rent "for such period as the DHCR determines." JA61-63; *see* 9 N.Y.C.R.R. § 2524.5(c). The theoretical existence of this narrow, "complex" procedure for converting rent-stabilized housing to business use—which is not available at all for parties, such as the Panagoulias Plaintiffs, whose properties are

not zoned for commercial use—does not save the amended RSL from working a taking. *Hodel v. Irving*, 481 U.S. 704, 716 (1987).

***Co-op/condo conversions*:** The 2019 Amendments eliminated eviction plans and made non-eviction plans subject to a requirement that a *majority* of tenants approve a condominium or co-op conversion. JA45-46, 63. Requiring the approval of a majority of tenants *and* allowing non-converting tenants to continue renting at stabilized rates on its face does not restore owners' use, possession, and exclusion rights.

By eliminating practical paths out of rent stabilization, the 2019 Amendments achieved the "permanent rent regulation" their backers promised. But that is just what *Yee* suggests that the Government may not do without providing just compensation.

### C. Plaintiffs Plausibly Allege As-Applied Physical-Takings Claims.

Plaintiffs also plausibly alleged physical-takings claims as applied to each Plaintiff (other than 177 Wadsworth, which exclusively asserts facial takings claims). JA46-64, 104-06. The many problematic features of the RSL described above, as specifically applied to Plaintiffs, deprive Plaintiffs of the right to possess, use, and exclude others from their apartments.

***Panagouliases*:** The RSL has "compel[led]" the Panagouliases "over objection to rent [their] property," *Yee*, 503 U.S. at 528, by, among other things requiring

them to offer renewal leases to at least one tenant to whom they would not have voluntarily leased an apartment. JA58. Short of demolishing the building and paying huge stipends to tenants, there is nothing the Panagouliases can do to end that tenancy. *See also* JA61-62 (apartments owned by Panagouliases not zoned for business use and thus cannot be converted to that purpose). Further, as a result of the 2019 Amendments' elimination of the RSL's decontrol provisions, the Panagouliases cannot convert their rent-stabilized apartments to other uses, such as free-market housing. JA65, 71-72.

The Panagouliases also cannot reclaim their apartments for personal use. Dino Panagoulias tried to recover a two-bedroom apartment in the building as a primary residence for his family, but housing authorities forbade him from doing so because he had not previously moved into a one-bedroom apartment that had been available, but which would have been too small for his family. JA52. Likewise, although Maria Panagoulias would like to occupy a unit in the family-owned building, the amended RSL prevents the family from making an apartment available for her. *Id*. And at least one of their tenants is either over the age of 62, disabled or impaired, or has lived in the apartment for 15 years or longer, meaning that the Panagouliases could reclaim the apartment(s) only if they are able to find the tenant

"equivalent or superior housing accommodation at the same or lower stabilized rent in a closely proximate area." JA50, 53.

***Eighty Mulberry*:** The RSL has injured Eighty Mulberry—a family-owned corporation that has owned its apartment building since at least 1950, before the RSL existed—in similar ways. After an elderly Eighty Mulberry tenant passed away, Eighty Mulberry was obliged to continue renting her rent-stabilized apartment to her children, who succeeded to her tenancy and remain in the apartment. JA58-59. And, like the Panagouliases, Eighty Mulberry has been required to offer a renewal lease to at least one tenant to which it would not have otherwise offered such a lease. JA58. Nor can Eighty Mulberry, as a business entity, recover for its shareholders' personal use even a single one of the apartments it owns. JA46-47.

***74 Pinehurst and 141 Wadsworth*:** Like the other Plaintiffs that assert as-applied physical-takings claims, 74 Pinehurst and 141 Wadsworth have been required on at least one occasion to offer renewal leases to tenants to whom they would not otherwise have offered renewals. JA58. And like Eighty Mulberry, these property owners are both organized as business entities, preventing them from recovering any apartments for the personal use of their members.

### D. The District Court's Reasoning Is Flawed.

The District Court dismissed Plaintiffs' facial and as-applied claims on the same grounds. According to the District Court, "[p]hysical takings are characterized

by a deprivation of the entire bundle of property rights in the affected property interest." SA15 (cleaned up). Because Plaintiffs retain some rights in their property—namely, "they continue to possess the property (in that they retain title), and they can dispose of it (by selling)"—they could not, in the District Court's view, state physical-takings claims. SA15; *see also* SA17 (dismissing as-applied claims "for the same reasons" because "[n]o Plaintiff alleges that they have been deprived of title to their property, or that they have been deprived of the ability to sell the property if they choose"). This holding was erroneous.

Neither the Supreme Court nor this Court has ever suggested that, to state a physical-takings claim, a plaintiff must allege that he or she has lost title to the property or the right to sell it. To the contrary, a physical-takings claim merely requires the plaintiff to allege a substantial physical occupation of property. In *Loretto*, for example, the Supreme Court found a physical taking and *expressly rejected* the argument that the owner's retention of title and ability to sell the property in question disqualified the physical occupation as a taking. *See id.* at 436 (taking occurred even though "the owner may retain the bare legal right to dispose of the occupied space by transfer or sale," because impositions on property "will ordinarily empty the right [to transfer or sale] of any value, since the purchaser will also be unable to make any use of the property"); *see also Causby*, 328 U.S. 256, 262 (1946) (repeated low-

altitude overflights worked taking of farm, notwithstanding that the owner's "enjoyment and use of the land [we]re not completely destroyed").

Similarly, *Nollan* left "no doubt" that the Government's requisitioning of an easement allowing the public to traverse private land to gain access to the ocean would constitute a physical taking, 483 U.S. at 831-32, even though the owner would retain title and the ability to sell the land despite that easement. *See also Kaiser Aetna*, 444 U.S. at 180 (law providing public-access right to private marina "result[ed] in an actual physical invasion" in violation of Takings Clause); *Causby*, 328 U.S. at 261-63. That the RSL leaves owners of rent-stabilized properties with formal title to, and the ability to sell, their properties does not mean that it does not effect a physical taking.

The District Court also cited decisions from this Court addressing prior versions of the RSL, but none of those decisions supports the ruling here, for three reasons.

*First*, all but one of the cases cited by the District Court were non-precedential, unpublished summary orders. SA17. And as discussed below, the Supreme Court recently repudiated the reasoning of the one published decision—*Fed. Home*

*Loan Mortg. Corp. v. N.Y. State Div. of Housing & Cmty. Renewal*, 83 F.3d 45, 47 (2d Cir. 1996) ("*FHLMC*").

*Second*, none of this Court's prior decisions address the current version of the RSL. That courts upheld prior versions of the RSL says little about whether the statute in its current form—described by sponsors as adopting "sweeping" changes that ushered in "the strongest tenant protections in history," including "permanent rent regulation," JA96—effects a physical taking. Indeed, if the District Court's rationale were correct, a new statute expropriating title to all privately owned housing in New York would be immune from challenge so long as the statute was codified as an amendment the RSL.

*Third*, this Court's reasoning in cases like *FHLMC* and *Harmon* conflicts with the Supreme Court's subsequent decision in *Horne*. This Court has previously stated that rent stabilization laws do not effect a physical taking where the plaintiff purchased a building and "acquiesced in its continued use of rental housing." *FHLMC*, 83 F.3d at 48; *Harmon*, 412 F. App'x at 422. In *Horne*, the Supreme Court rejected the Government's argument that a law requiring raisin growers to turn over a portion of their crop to the Government was "not a taking because raisin growers voluntarily chose to participate in the raisin market." 576 U.S. at 365. As the Court explained, "'a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation,'" and "a governmental mandate

to relinquish specific, identifiable property as a 'condition' on permission to engage in commerce effects a per se taking." *Id.* (quoting *Loretto*, 458 U.S. at 439 n.17). As *Horne* makes clear, Plaintiffs did not, by buying buildings and using them as rental housing *under an earlier version of the RSL* (or in the case of Eighty Mulberry, no RSL at all), "acquiesce" to subsequent legislation that forces Plaintiffs to use their property as rent-stabilized housing in perpetuity.

## II. Plaintiffs Plausibly Allege Regulatory-Takings Claims.

The RSL inflicts a regulatory taking on Plaintiffs because it forces them "to bear public burdens[,] which, in all fairness and justice, should be borne by the public as a whole." *Penn Central*, 438 U.S. at 123 (quoting *Armstrong*, 364 U.S. at 49). The New York Court of Appeals has confirmed that the RSL provides "a public assistance benefit" "conferred *by* the government" but "paid for" by regulated "private owners of real property." *Pereira*, 24 N.Y.3d at 291.

The 2019 Amendments exacerbated that usurpation of private property by further eroding Plaintiffs' use, possession, and exclusion rights, by preventing Plaintiffs from recovering their capital investments, and by making it impossible for Plaintiffs to earn a reasonable rate of return. Thus, regardless of whether the RSL previously passed constitutional muster, Plaintiffs have adequately pleaded both as-applied and facial regulatory-takings claims because they plausibly allege that the current RSL

"goes so far beyond ordinary regulation" of rental housing "as to amount to a taking" of their property. *Kaiser Aetna*, 444 U.S. at 178.

### A. Plaintiffs 74 Pinehurst and 141 Wadsworth Plausibly Allege As-Applied *Penn Central* Claims.

Government regulation results in a taking when, among other things, it "goes too far" in interfering with the owner's property rights. *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922); *see also Murr v. Wisconsin*, 137 S. Ct. 1933, 1950 (2017). The Supreme Court has identified three main factors for courts to consider in determining whether a regulation "goes too far": (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the government action." *Penn Central*, 438 U.S. at 124.

The *Penn Central* test requires "ad hoc, factual inquiries," *Kaiser Aetna*, 444 U.S. at 175, under which the reviewing court engages in holistic and "careful examination and weighing of all the relevant circumstances," *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (cleaned up); *Yee*, 503 U.S. at 523 (*Penn Central* "necessarily entails complex factual assessments of the purposes and economic effects of government actions"). In that analysis, each factor is important, but no single factor is "dispositive" or "talismanic." *Tahoe-Sierra*, 535 U.S. at 322; *Palazzolo v. Rhode Island*, 533 U.S. 606, 634 (2001) (O'Connor, J., concurring).

For the Plaintiffs who press as-applied regulatory-takings claims on appeal (*i.e.*, 74 Pinehurst and 141 Wadsworth),[7] the District Court correctly held that they sufficiently pleaded two of the *Penn Central* factors: the economic impact of the regulation, and the character of the government action. However, the court erred in holding that Plaintiffs had not sufficiently pleaded that the amended RSL interfered with their investment-backed expectations.

#### 1. *The District Court Correctly Held That Two* Penn Central *Factors Were Well Pleaded.*

The first *Penn Central* factor focuses on the economic impact of the challenged regulation. 438 U.S. at 124. Plaintiffs plausibly allege that the RSL inflicts substantial economic harm in several ways. *First*, Plaintiffs alleged that the 2019 Amendments "significantly reduced" the value of their rent-stabilized apartments. JA65, 107 (alleging 20-40% reduction in value of buildings owned by Plaintiffs, on top of 50% reduction caused by pre-2019 RSL). *Second*, Plaintiffs have plausibly alleged that the RSL has "forc[ed] them to lease the rent-stabilized apartments they own at substantially below-market rates." JA68-69. As amended, the RSL not only caps the rent owners may legally charge, but also compels owners to continue renting at preferential rates that are below the legal maximum and which they offered only

[7] Plaintiff 177 Wadsworth did not assert an as-applied regulatory-takings claim, and the Panagoulias and Eighty Mulberry Plaintiffs dismissed their as-applied regulatory-takings claims with prejudice. The only as-applied *Penn Central* claims before this Court on appeal are thus those asserted by 74 Pinehurst and 141 Wadsworth. In discussing these claims, "Plaintiffs" refers to only these parties.

on a short-term basis. JA72-77. This requirement has resulted in lost income for Plaintiffs, who leased units at preferential rates and now cannot restore those units to the legal maximum rent, as they and their tenants had previously agreed. JA75-76. *Third*, the economic harms inflicted by the 2019 Amendments are so great as to jeopardize Plaintiffs' ability to refinance the mortgage loans on their properties in the future. JA69. The District Court correctly held that these allegations were sufficient to survive a motion to dismiss. SA30.

The third *Penn Central* factor looks to the "character of the governmental action." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). Two aspects of the amended RSL strongly support the conclusion that the law effects a regulatory taking. *First*, the amended RSL has the character of a taking, not an economic regulation, because it disproportionately imposes the costs of maintaining a public-welfare program on private property owners and lacks any corresponding "reciprocity of advantage" to such owners. *Mahon*, 260 U.S. at 415.[8] *Second*, the amended RSL is the functional equivalent of a physical seizure of private property. *See Lingle*, 544 U.S. at 539. Under *Penn Central*, takings "may more readily be found when the interference with property can be characterized as a physical invasion by

[8] *See Pennell v. City of San Jose*, 485 U.S. 1, 22 (1988) (Scalia, J., concurring in part and dissenting in part) ("The fact that government acts through the landlord-tenant relationship does not magically transform general public welfare, which must be supported by all the public, into mere 'economic regulation,' which can disproportionately burden particular individuals.").

government." 438 U.S. at 124. For the same reasons that the law effects an *actual* physical taking, it at a minimum shares the "character" of such a taking. *See* Part I.B, *supra*. The District Court correctly refused to dismiss Plaintiffs' claims for failure to plead the requisite "character" of the government action, holding instead that this element was not fit for resolution on the pleadings. SA33.

#### 2. *The District Court Erred in Holding that Plaintiffs Lacked Reasonable Investment-Backed Expectations.*

The second *Penn Central* factor analyzes the degree to which the regulation interferes with property owners' reasonable investment-backed expectations. 438 U.S. at 124. Plaintiffs plausibly allege that the amended RSL interferes with their reasonable expectations in significant ways, and the District Court erred in holding otherwise.

Plaintiffs allege that the 2019 Amendments prevent them from fully recovering their capital investments. Plaintiff 141 Wadsworth spent nearly $80,000 upgrading the building's electrical system before enactment of the 2019 Amendments. JA81-82. At the time, the RSL authorized 141 Wadsworth to recoup the full amount of this investment through rate increases. *Id.* The 2019 Amendments, however, reduced by two-thirds the amount that landlords can increase rent to recover the costs of major capital improvements, and limited recoverable costs to those the Government deems "reasonable." JA79-80. Although 141 Wadsworth applied to recoup its investment before the 2019 Amendments took effect, the State did not act

on the application until after the 2019 Amendments had taken effect, and as a result 141 Wadsworth will not be able to fully recover its investment. JA81-82; *see also* JA82 (similar allegations regarding 177 Wadsworth).

Moreover, the 2019 Amendments will also prevent Plaintiffs from earning a reasonable rate of return on their apartments. As discussed above, the amended RSL forces Plaintiffs to charge below-market rents. The annual rent adjustments authorized by the Rent Guidelines Board have increased less than half as much as owners' operating costs. JA66 (mere 20% increase in rents, despite 45% increase in operating costs, since 2008). As a result, Plaintiffs' ability to refinance the loans on their buildings is in doubt. JA69. And where owners such as 74 Pinehurst have offered tenants preferential rents as one-time concessions, the amended RSL locks in those rents, preventing owners from charging even the below-market rents authorized by the RSL. JA72-77.

The 2019 Amendments likewise severely restrict the circumstances in which Plaintiffs can evict tenants who have not paid rent. *See supra* pp. 26-27. By allowing nonpaying tenants to remain in apartments for a year after they are determined to have breached their leases, and by allowing the eviction of only the individuals named in a warrant (and not individuals occupying the apartment unlawfully), the RSL effectively requires owners to provide rent-free housing for extended periods. Although Defendants no doubt have a valid interest in housing the indigent, "a strong

public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way." *Horne*, 576 U.S. at 362 (citation omitted).

The District Court held that these allegations were insufficient because Plaintiffs purchased their properties knowing that the RSL "had been amended multiple times" and thus should have "understood it could change again." SA32. In the District Court's view, Plaintiffs that purchased their property before the RSL took effect could plead regulatory-takings claims, but Plaintiffs that purchased their property after the RSL took effect could not. SA32-33.

The District Court's reasoning is precluded by the Supreme Court's decision in *Palazzolo*, 533 U.S. at 606. There, the Rhode Island Supreme Court held that a property owner could not bring a *Penn Central* challenge to a law in effect when the owner purchased the property, explaining that "he could have had no reasonable investment-backed expectations that were affected by this regulation because it predated his ownership." *Id.* (cleaned up). The Supreme Court reversed. *Id.* In so doing, the Court refused to adopt a categorical rule that treated property owners differently based on when they acquired the property. *Id.* ("A regulation or common-law rule cannot be a background principle for some owners but not for others."). Accordingly, a *Penn Central* "claim is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction." *Id.* There is

simply no way to reconcile that rule announced in *Palazzolo*—which permits property owners to challenge existing laws—with the rule applied by the District Court, which precludes Plaintiffs from challenging *new* laws adopted *after* they acquired their property.

The District Court cited this Court's decision in *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252 (2d Cir. 2014), but that decision does not support the District Court's rationale. *Calloway* involved a New York law that provides a "homestead exemption" that protects homeowners against seizures of their dwelling to satisfy a money judgment. *Id.* at 257. The law had been in effect for more than 150 years and, during that time, the amount of the exemption had increased periodically and had gone from $1,000 to $75,000. *Id.* Those increases were deemed necessary "[t]o account for rising home values" and "to keep pace with the times." *Id.* at 257, 267. This Court affirmed the dismissal of a *Penn Central* claim brought by a creditor challenging the increase of the exemption from $10,000 to $50,000. *Id.* at 267. In so doing, the Court explained that this incremental increase in the exemption could not "upset [plaintiff's] reasonable investment-backed expectations" because it was "predictabl[e] and neccessar[y]" that the exemption amount "must be adjusted from time to time to account for the changing values of the homes it protects." *Id.*

Plaintiffs' claim is nothing like *Calloway*. Plaintiffs do not challenge a predictable, inflation-based adjustment to the RSL. They instead allege that the State "radically altered New York's rent-stabilization regime, narrowing property owners' rights in unprecedented ways and imposing new restrictions that make it difficult or impossible for property owners to earn a return on their investments." JA42. From the mid-1970s, the RSL sought to facilitate a "transition from regulation to a normal market of free bargaining between landlord and tenant," N.Y. Unconsol. Law § 8622, not to make "permanent rent regulation" the law of the State or to "defend[] and preserv[e]" the existing stock of rent-stabilized housing. JA38-40, 96. Indeed, legislators acknowledged that the 2019 Amendments were an unprecedented measure that created "the strongest tenant protections in history." JA96. Any suggestion that the 2019 Amendments did not come as a harsh surprise to owners is belied by market data showing that the value of rent-stabilized properties plummeted by an additional 20-40% after enactment of those Amendments. JA65. The District Court erred in holding that Plaintiffs' lacked reasonable investment-backed expectations as a matter of law.

### B. Plaintiffs Plausibly Allege Facial Regulatory-Takings Claims.

Plaintiffs also pleaded facial regulatory-takings claims based on allegations similar to those supporting the as-applied claims. Plaintiffs alleged that the RSL causes significant economic harm to property owners by drastically limiting rent

increases, curtailing the ability of property owners to recoup costs, and making it virtually impossible for owners to leave the rental business. JA111-12. They alleged that the RSL interferes with property owners' investment-backed expectations by eliminating the pathways to deregulate rent-stabilized apartments, JA69-71, restricting owners' ability to recover the cost of IAIs and MCIs, JA77-81, and forcing owners to charge reduced "preferential" rents even after a lease expires, JA45. Plaintiffs also alleged that the RSL's sweeping restrictions infringe core property rights and force owners to subsidize more than their fair share of the burdens of government. JA109.[9]

In dismissing these claims, the District Court concluded that the RSL "is not generally susceptible" to facial challenge as a regulatory taking. SA21. The court based that conclusion on its view that, to state a facial claim, Plaintiffs needed to "show there is 'no set of circumstances,' in which the RSL applies constitutionally" SA21 (quoting *Salerno*, 481 U.S. at 745)—a showing that is "virtually impossible" for a plaintiff to make. SA21. The court misstated the law on facial challenges.

---

[9] Courts often consider two additional factors within the "character" prong of the *Penn Central* analysis, and those factors also favor finding a taking here. Plaintiffs plausibly allege that the RSL does not produce an "average reciprocity of advantage" for property owners. JA113-14; *see Mahon*, 260 U.S. at 415. Nor does the RSL seek to remedy noxious use of property, one of the primary reasons courts have relied upon in rejecting takings challenges to intrusive property regulations. JA119; *see Penn Central*, 478 U.S. at 125-27.

Regulatory-takings claims may be brought on a facial basis. Facial challenges are not limited to a subset of constitutional rights. *See City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). Nor is there reason to "relegat[e] [the Takings Clause] to the status of a poor relation among the provisions of the Bill of Rights," by precluding facial claims under this one Clause. *Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162, 2169 (2019). Rather, the Supreme Court has repeatedly entertained facial *Penn Central* challenges without suggesting that such claims are categorically barred. *See Tahoe-Sierra*, 535 U.S. at 321; *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 213, 224-28 (1986); *Hodel v. Va. Surface Min. and Reclamation Ass'n, Inc.*, 452 U.S. 264, 295 (1981). Facial regulatory-takings claims may face an "uphill battle" at summary judgment, *Keystone Bituminous Coal Ass'n v. DeBenedicti*, 480 U.S. 470, 495 (1987), but that statement does not suggest that such claims are categorically barred—if they were, there would be no need for *any* battle.

In reaching the contrary conclusion, the District Court relied on a summary order "suggest[ing]" that the RSL is "not susceptible to facial constitutional" challenge. *West 95 Housing Corp. v. N.Y.C. Department of Housing Preservation and Development*, 31 F. App'x 19, 21 (2d Cir. 2002). That order is not binding and states this "suggest[ion]" only in passing. In any event, Plaintiffs *have* "pled facts that would support such a 'complex factual assessment of the economic effects' of the RSL on all ... property owners." *Cf. id.* (quoting *Yee*, 503 U.S. at 523) (cleaned up).

The District Court also erred by invoking *Salerno*'s "no set of circumstances" test. SA22. Subsequent decisions have clarified that "[t]o succeed in a typical facial attack, [a plaintiff] would have to establish that no set of circumstances exists under which [the statute] would be valid, *or* that the statute lacks any plainly legitimate sweep." *Stevens*, 559 U.S. at 472 (emphasis added) (cleaned up); *see also United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (applying "plainly legitimate sweep test").

The amended RSL lacks a "plainly legitimate sweep" because it results in a compelled physical invasion "in a large fraction of the cases in which [it] is relevant." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 895 (1992). Plaintiffs have alleged that the amended RSL "generally requires that the owner of a rent-stabilized apartment must continue renting the apartment out to third parties" and that "the RSL prohibits property owners, including Plaintiffs, from retiring from the business of apartment leasing, closing his or her building to tenants, or holding the property as a long-term investment." JA62-64. Speculation that some owner might exist who wishes to destroy his building to save his apartments from rent stabilization, or who can navigate the gamut of obstacles to converting her building to commercial use, does not show that the statute has a plainly legitimate sweep.

The District Court concluded that Plaintiffs failed to plead that the RSL caused economic harm to support a facial claim because different property owners would

be harmed to different degrees. SA21-22. But Plaintiffs allege that *all* property owners are significantly harmed because they must bear a burden that "in all fairness and justice, should be borne by the public as a whole." *Palazzolo*, 533 U.S. at 617-18; *Pennell*, 485 U.S. at 21-23 (Scalia, J., dissenting). Although the effects of the RSL may vary in their details from one owner to the next, Plaintiffs have nevertheless alleged that the 2019 Amendments broadly inflict economic harm by diminishing existing properties' value, limiting owners' ability to make necessary capital investments, and radically upending investment-backed expectations reasonably formed under the preexisting RSL. JA64-85.

Finally, the District Court held that Plaintiffs had not sufficiently pleaded an interference with investment-backed expectations because "[d]ifferent landlords bought at different times" and under "different incarnations of the RSL." SA23. The district erred in differentiating between property owners based on when they purchased their properties. *See supra* pp. 47-49. Regardless of when an owner acquired property, the 2019 Amendments made fundamental changes in the law that interfered with owners' expectations.

## III. Plaintiffs Plausibly Allege a Due Process Claim.

Plaintiffs state a due process claim because they plausibly allege that the RSL creates and perpetuates the housing "emergency" it is supposed to solve. Heightened scrutiny should apply here because the RSL interferes with "fundamental rights and

liberties … deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Indeed, property rights are expressly protected in the Bill of Rights. *See* U.S. Const. Amend. V. The RSL violates due process under heightened scrutiny because it significantly interferes with fundamental property rights by restricting, among other things, "the power to exclude," which "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto*, 458 U.S. at 435.

In any event, Plaintiffs pleaded a due process claim under rational-basis review. Although "rational basis review is indulgent and respectful, it is not meant to be toothless." *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018) (cleaned up). Plaintiffs plausibly allege that the State's reauthorization of the RSL in 2019 was not a rational approach to remedying a purported housing emergency given the factual context in which the reauthorization occurred. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) (applying rational-basis review requires consideration of "factual context" in which law was passed); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013) (court applying rational-basis review should consider the "history of [the] challenged rule" and the "context of its adoption").

The District Court ignored the merits of Plaintiffs' allegation, instead concluding that the RSL "must be upheld so long as any one [of its justifications] is

valid." SA36. Although it is true that "a law [need not] serve more than one legitimate purpose," *Preseault v. ICC*, 494 U.S. 1, 18 (1990), there must also be a "reasonable fit between [the] governmental purpose … and the means chosen to advance that purpose," *Reno v. Flores*, 507 U.S. 292, 305 (1993).

The Complaint includes numerous allegations showing that the RSL lacks such a fit. JA41, 89-102. In 2017, for example, the vacancy rate for rent-stabilized units was 2.06% while the vacancy rate for non-stabilized apartments was 6.07%. JA41, 94. The complaint thus plausibly alleges, with specific factual support, that the RSL is the *cause* of the vacancy rate not being in excess of 5%. Treating this allegation as true—together with its logical corollary, which is that *repealing* the RSL would result in vacancy rates exceeding the 5% emergency threshold—the complaint necessarily states a claim that the RSL is not rationally related to solving the vacancy-rate "emergency." That alone should have been enough to defeat Defendants' motion to dismiss. *See Bass Plating Co. v. Town of Windsor*, 639 F. Supp. 873, 880 (D. Conn. 1986) (invalidating regulation on due process grounds that had "no reasonable relationship [to] … the asserted objectives"); *see also St. Joseph Abbey*, 712 F.3d at 226 ("The great deference due [to] state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation.").

In reaching the contrary conclusion, the District Court did not properly apply Rule 12(b)(6)'s liberal pleading standard or rational-basis review. The court acknowledged Plaintiffs' allegations that "laws like the RSL do not work for their intended purpose, and indeed may do substantially more harm than good." SA34. But the court disregarded those allegations because, in in the court's view, it was "bound to defer to legislative judgments." SA35. Even when a court resolves the merits of a rational-basis claim, it cannot defer to a legislative judgment without first determining that the judgment is rational. That assessment should be made on an evidentiary record because, "although rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *St. Joseph Abbey*, 712 F.3d at 223. Moreover, regardless of the showing Plaintiffs must make to prevail on the *merits*, they need not definitively refute a proffered basis for a law at the *pleading stage*. Instead, they need only plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678; *see also Wroblewski v. City of Washburn*, 965 F.2d 452, 459-60 (7th Cir. 1992) (rational-basis test "cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard").

The District Court also concluded that the RSL furthers the Government's objective of "neighborhood stability and continuity." SA35. This justification is

premised on the view that a neighborhood is harmed by the arrival of new residents, but there is no basis to accept that premise, much less accept it as a matter of law on a motion to dismiss. Defendants never explained why new residents are so harmful to a community that the law must ensure that a rent-stabilized apartment can remain with the same family for generations. That the RSL discriminates against young tenants and recent immigrants to the State, JA90-91, 96-97, is evidence of the law's irrationality, not a basis to uphold it.

## IV. Sovereign Immunity Does Not Shield the State Defendants From Liability.

The District Court dismissed Plaintiffs' claims against the State, DHCR, and Commissioner Visnauskas in her official capacity (insofar as Plaintiffs sought just compensation), concluding that they are barred by sovereign immunity. SA6-12. That ruling fails to account for the Taking Clause's self-executing character.

The Eleventh Amendment generally bars claims against state actors absent a waiver of sovereign immunity. *See Edelman v. Jordan*, 415 U.S. 651, 663-64 (1974). But the general rule does not apply where the states "surrender[ed]" sovereign immunity as part of "the plan of the [constitutional] convention." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997). The Takings Clause does just that. As the Supreme Court has observed, the Takings Clause is "self-executing," *First English*, 482 U.S. at 315, such that a "compensation remedy"

"automatically arises" whenever "the government takes property without paying for it," *Knick*, 139 S. Ct. at 2171.

Due to the Taking Clause's "self-executing character," a property owner may bring takings claims without "statutory recognition" or "a promise to pay" on behalf of the state, because "a promise [is] implied" based on the "duty to pay imposed by the [Fifth] Amendment." *First English*, 482 U.S. at 315 (cleaned up). In dicta, this Court has described takings claims as "distinguishable" from other types of claims due to the "self-executing aspects' of the Fifth Amendment's provision requiring just compensation where private property is taken for public use." *Duarte v. United States*, 532 F.2d 850, 852 n.3 (2d Cir. 1976) (cleaned up).[10]

Neither the Supreme Court nor this Court has squarely addressed whether sovereign immunity bars claims against nonconsenting State defendants under the Takings Clause, and other courts are split on the issue. But the better-reasoned decisions hold that sovereign immunity does not overcome the Takings Clause's self-executing nature. *See, e.g., Hair v. United States*, 350 F.3d 1253, 1257 (Fed. Cir. 2003) ("It is true that sovereign immunity does not protect the government from a Fifth Amendment Takings claim because the constitutional mandate is 'self-executing.'"); *Leistiko v. Sec'y of Army*, 922 F. Supp. 66, 73 (N.D. Ohio 1996) ("The Just

[10] The Taking Clause's mandatory remedy did not originally apply to the States, but that changed with the ratification of the Fourteenth Amendment. *Dolan v. City of Tigard*, 512 U.S. 374, 384 n.5 (1994).

Compensation Clause, with its self-executing language, waives sovereign immunity because it can fairly be interpreted as mandating compensation by the government for the damage sustained."); *Manning v. N.M. Energy, Minerals & Nat. Res. Dep't*, 144 P.3d 87, 97-98 (N.M. 2006); *but see* SA8 (citing cases reaching opposite conclusion).

As the Supreme Court of New Mexico explained, "a right and a remedy textually rooted in the Constitution supersedes or 'trumps' state constitutional sovereign immunity." *Manning*, 144 P.3d at 93 (citing *Alden v. Maine*, 527 U.S. 706, 740 (1999)). In other words, "the balance of power shifts when 'the obligation arises from the Constitution itself.'" *Id.* Moreover, requiring states to waive their immunity in order to be sued under the Takings Clause would contravene the Fifth Amendment's purpose as "a check against abusive government power," *id.* at 97, and its "straight text[]," which "require[s] the government to provide money damages [for a taking], notwithstanding other[] applicable sovereign immunity bars." Eric Berger, *The Collision of the Takings and State Sovereign Immunity Doctrines*, 63 Wash. & Lee L. Rev. 493, 519 (2006); *see also* Note, *Reconciling State Sovereign Immunity with the Fourteenth Amendment*, 129 Harv. L. Rev. 1068 (2016).

The District Court also held that sovereign immunity trumps the Takings Clause because New York "provides a remedy of its own for an alleged [takings] violation." SA36. Under that view, federal takings claims could be asserted against

state defendants in state court only—a limitation not imposed on any other constitutional right. That approach would "relegate" the Takings Clause "to the status of a poor relation" among the Bill of Rights, something the Supreme Court has repeatedly held improper. *Dolan*, 512 U.S. at 392.

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's judgment and remand for further proceedings.

Respectfully submitted,


*/s/ Jonathan M. Sperling*
Jonathan M. Sperling
S. Conrad Scott
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
jsperling@cov.com
cscott@cov.com

Mark W. Mosier
Kevin King
Ethan A. Sachs
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St. NW
Washington, D.C. 20001-4956
(202) 662-6000
mmosier@cov.com
kking@cov.com
esachs@cov.com

*Counsel for Plaintiffs-Appellants 74 Pinehurst LLC, 141 Wadsworth LLC, 177 Wadsworth LLC, Dino Panagoulias, Dimos Panagoulias, Vasiliki Panagoulias, Eighty Mulberry Realty Corporation*

April 30, 2021

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Circuit Rule 32.1(a)(4)(A) because it contains 13,998 words, exclusive of the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman and 14 point font.

April 30, 2021

*/s/ Jonathan M. Sperling*

Jonathan M. Sperling
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on April 30, 2021. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

April 30, 2021

*/s/ Jonathan M. Sperling*

Jonathan M. Sperling
*Counsel for Appellants*



# SPECIAL APPENDIX

## TABLE OF CONTENTS


PAGE

Memorandum and Order, dated September 30, 2020 .................... SPA-1

Memorandum and Order, dated November 19, 2020 .................. SPA-41

Judgment, dated February 11, 2021 ................................ SPA-43

Revised Judgment, dated March 5, 2021 ............................ SPA-44

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------x

COMMUNITY HOUSING IMPROVEMENT PROGRAM, RENT STABILIZATION ASSOCIATION OF N.Y.C., INC., CONSTANCE NUGENT-MILLER, et al.,

Plaintiffs,

-against-

19-cv-4087(EK)(RLM)

CITY OF NEW YORK, RENT GUIDELINES BOARD, DAVID REISS, CECILIA JOZA, ALEX SCHWARZ, GERMAN TEJEDA, MAY YU, et al.,

Defendants.

---------------------------------------------x

**MEMORANDUM AND ORDER**

74 PINEHURST LLC, 141 WADSWORTH LLC, 177 WADSWORTH LLC, DINO PANAGOULIAS, DIMOS PANAGOULIAS, et al.,

Plaintiffs,

-against-

19-cv-6447(EK)(RLM)

STATE OF NEW YORK, NEW YORK DIVISION OF HOUSING AND COMMUNITY RENEWAL, RUTHANNE VISNAUSKAS, et al.,

Defendants.

---------------------------------------------x

ERIC KOMITEE, United States District Judge:

Rent regulations have now been the subject of almost a hundred years of case law, going back to Justice Holmes. That case law supports a broad conception of government power to

regulate rents, including in ways that may diminish — even significantly — the value of landlords' property.

In 2019, the New York State legislature amended the state's rent-stabilization laws (RSL). As amended, the RSL now goes beyond previous incarnations of the New York statute in its limitations on rent increases, deregulation of units, and eviction of tenants in breach of lease agreements, among other subjects. Plaintiffs claim that in light of the 2019 amendments, the RSL (in its cumulative effect) is now unconstitutional.

This opinion concerns two cases. Plaintiffs in *Community Housing Improvement Program v. City of New York* (19-cv-4087) are various landlords and two landlord-advocacy groups, the Community Housing Improvement Program and the Rent Stabilization Association (the "CHIP Plaintiffs"). Plaintiffs in *74 Pinehurst LLC v. State of New York* (19-cv-6447) are landlords 74 Pinehurst LLC, Eighty Mulberry Realty Corporation, 141 Wadsworth LLC and 177 Wadsworth LLC, and members of the Panagoulias family (the "Pinehurst Plaintiffs"). Because of the significantly overlapping claims and issues of law in the two cases, the Court addresses them here in a single opinion.[1]

---

[1] The Court does not, however, consolidate the cases. Accordingly, the Court issues a separate judgment in CHIP, as directed below.

Pursuant to 42 U.S.C. § 1983, Plaintiffs assert (a) a facial claim that the RSL violates the Takings Clause (as both a physical and a regulatory taking); (b) in the case of certain Pinehurst Plaintiffs, a claim that the RSL, as applied to them, violates the Takings Clause (as both a physical and a regulatory taking); (c) a facial claim that the RSL violates their due-process rights; and (d) a claim that the RSL violates the Contracts Clause, as applied to each Pinehurst Plaintiff.[2] They seek an order enjoining the continued enforcement of the RSL, as amended; a declaration that the amended law is unconstitutional (both on its face and as-applied); and monetary relief for the as-applied Plaintiffs' Takings and Contracts Clause claims.

Supreme Court and Second Circuit cases foreclose most of these challenges. No precedent binding on this Court has ever found any provision of a rent-stabilization statute to violate the Constitution, and even if the 2019 amendments go beyond prior regulations, "it is not for a lower court to reverse this tide," *Fed. Home Loan Mortg. Corp. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 83 F.3d 45, 47 (2d Cir. 1996) (*FHLMC*) — at least in response to the instant facial challenges. Accordingly, the Court grants Defendants' motions to dismiss the

---

[2] Each Pinehurst Plaintiff brings as-applied challenges under the Takings Clause and Contracts Clause except for 177 Wadsworth LLC, which only brings an as-applied claim under the Contracts Clause.

facial challenges under the Takings Clause, the as-applied claims alleging physical takings, the due-process claims, and the Contracts Clause claims — as to all Plaintiffs. The Court denies, at this stage, the motions to dismiss the as-applied regulatory-takings claims brought by certain Pinehurst Plaintiffs only. Those claims may face a "heavy burden," *see Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493 (1987), but given their fact-intensive nature, it is a burden those Plaintiffs should be afforded an opportunity to carry, at least to the summary-judgment stage.

## I. Background

New York City has been subject to rent regulation, in some form, since World War I. But the RSL is of more recent vintage. It traces its roots to 1969, when New York City passed the law that created the Rent Guidelines Board (RGB) — the body that, to this day, continues to set rents in New York City. Five years later, New York State passed its own statute, which amended the 1969 law. Together, these laws formed the blueprint for today's RSL. The State and City have amended the RSL repeatedly since its initial enactment, culminating with the amendments at issue here.

The 2019 amendments, enacted on June 14, 2019, made significant changes. Most notably, they:

- Cap the number of units landlords can recover for personal use at one unit per building (and only upon a showing of immediate and compelling necessity). N.Y. Reg. Sess. § 6458, Part I (2019).
- Repeal the "luxury decontrol" provisions, which allowed landlords, in certain circumstances, to decontrol a unit when the rent reached a specified value. *Id.* at Part D, § 5.
- Repeal the "vacancy" and "longevity" increase provisions, which allowed landlords to charge higher rents when certain units became vacant. *Id.* at Part B, §§ 1, 2.
- Repeal the "preferential rate" provisions, which allowed landlords who had been charging rates below the legal maximum to increase those rates when a lease ended. *Id.* at Part E.
- Reduce the value of capital improvements — called "individual apartment improvements" (IAI) and "major capital improvements" (MCI) — that landlords may pass on to tenants through rent increases. *Id.* at Part K, §§ 1, 2, 4, 11.
- Increase the fraction of tenant consent needed to convert a building to cooperative or condominium use. *Id.* at Part N.
- Extend, from six to twelve months, the period in which state housing courts may stay the eviction of breaching tenants. *Id.* at Part M, § 21.

## II. Discussion

### A. <u>State Defendants' Eleventh Amendment Immunity</u>

Before turning to Plaintiffs' constitutional claims, the Court must address certain defendants' assertion of immunity

from suit. The "State Defendants" — the State of New York, the New York Division of Housing and Community Renewal (DHCR),[3] and DHCR Commissioner RuthAnne Visnauskas — argue that the Eleventh Amendment bars certain claims against them.[4] State Defendants' Motion to Dismiss for Lack of Jurisdiction in Part, ECF No. 67. The State Defendants did not raise the Eleventh Amendment defense until oral argument on their motion to dismiss for failure to state a claim — after the 12(b)(6) motions had been fully briefed. This omission is difficult to understand, to say the least; nevertheless, the Court must resolve these arguments, as they implicate its subject-matter jurisdiction. *See Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990); *see also* Fed. R. Civ. P. 12(h)(3).

The parties agree that sovereign immunity bars Plaintiffs' Due Process and Contracts Clause claims (with certain exceptions). Plaintiffs' Response to State Defendants' Motion to Dismiss for Lack of Jurisdiction in Part at 1, ECF No.

---

[3] The DHCR is the New York State agency charged with overseeing and administering the RSL.

[4] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Though the text does not speak to suits against states by their *own* residents, the Supreme Court held in *Hans v. Louisiana*, 134 U.S. 1 (1890), that the amendment also generally precludes such actions in federal court.

71. Therefore these claims cannot proceed against the State Defendants, except to the extent they seek declaratory relief against DHCR Commissioner Visnauskas (as explained below). The parties dispute, though, whether the Eleventh Amendment immunizes states against takings claims. *Id.*

There is an obvious tension between the Takings Clause and the Eleventh Amendment. The Eleventh Amendment provides the states with immunity against suit in federal court. Plaintiffs contend, however, that the Takings Clause's "self-executing" nature (meaning, its built-in provision of the "just compensation" remedy) overrides the states' immunity. In support, they cite several cases that have reached that conclusion (or related conclusions). *See, e.g.*, *Manning v. N.M Energy, Minerals & Nat. Res. Dep't*, 144 P.3d 87, 97-98 (N.M. 2006) (holding that the State of New Mexico could not claim immunity from regulatory-takings claims because the "'just compensation' remedy found in the Takings Clause . . . abrogates state sovereign immunity"); *see also Hair v. United States*, 350 F.3d 1253, 1257 (Fed. Cir. 2003) (holding that the federal government cannot claim immunity from takings claims because the Takings Clause is "self-executing"); *Leistiko v. Sec'y of Army*, 922 F.Supp. 66, 73 (N.D. Ohio 1996) (same).

Despite the fact that the Eleventh Amendment and Takings Clause date back so long, neither the Supreme Court nor

the Second Circuit has decisively resolved the conflict. The Second Circuit recently affirmed a decision that held the Eleventh Amendment to bar a takings claim, but in a non-precedential summary order that did not analyze the question in detail. *Morabito v. New York*, 803 F. App'x 463, 464-65 (2d Cir. 2020) (summary order) (affirming because the Eleventh Amendment "generally bars suits in federal courts by private individuals against non-consenting states"), *aff'g* No. 6:17-cv-6853, 2018 WL 3023380 (W.D.N.Y. June 18, 2018). Thus the Court must reach the question squarely.

The overwhelming weight of authority among the circuits contradicts the cases cited by Plaintiffs, *supra*. These cases hold that sovereign immunity trumps the Takings Clause — at least where, as here, the state provides a remedy of its own for an alleged violation.[5] The reasoning of one such case, *Seven Up Pete Venture v. Schweitzer*, 523 F.3d 948 (9th Cir. 2008), is instructive. In that case, the Ninth Circuit analogized the question of Takings Clause immunity to the Supreme Court's holding in *Reich v. Collins*, which concerned a tax-refund due-process claim. 513 U.S. 106 (1994). In *Reich*,

[5] *See* N.Y. Const. art. I, § 7(a) ("Private property shall not be taken for public use without compensation."). No court has reached the ultimate question of whether the Takings Clause usurps the Eleventh Amendment when no remedy is available in the state courts. Given New York's express remedy, this Court need not reach that issue.

the plaintiff sued the Georgia Department of Revenue and its commissioner in federal court to recover payments he had made pursuant to a tax provision later found unconstitutional. *Id.* at 108. The Supreme Court held that when states require payment of contested taxes up front, the Due Process Clause requires them to provide, in their own courts, a forum to recover those payments if the revenue provision in question is later held invalid — even if the Eleventh Amendment would bar the due-process claim in federal court. *Id.* at 109.

The Ninth Circuit in *Seven Up* reasoned that the Takings Clause, like the Due Process Clause, "can comfortably co-exist with the Eleventh Amendment immunity of the States," provided state courts make a "constitutionally enforced remedy" available. *Seven Up*, 523 F.3d at 954-55. *Seven Up*'s conclusion is consistent with the weight of circuit authority. *See Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456-57 (5th Cir. 2019) (holding that Eleventh Amendment barred takings claim in federal court, where plaintiff had already sued in state court but received less compensation than he sought); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1213-14 (10th Cir. 2019) (holding that the Eleventh Amendment barred a federal takings claim against the State of Utah, after confirming that Utah offered a forum for the claim); *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 552 (4th Cir. 2014) (concluding "that the Eleventh

Amendment bars Fifth Amendment taking claims against States *in federal court* when the *State's courts* remain open to adjudicate such claims"); *Jachetta v. United States*, 653 F.3d 898, 909-10 (9th Cir. 2011) (holding that the Eleventh Amendment barred claims brought against the state in federal court under the federal Takings Clause, but that the plaintiff could seek Supreme Court review if the state court declined to hear the claim); *DLX, Inc. v. Kentucky*, 381 F.3d 511, 526-28 (6th Cir. 2004) (holding that Eleventh Amendment immunity barred federal takings claim, but that state court "would have had to hear that federal claim"), *overruled on other grounds San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323 (2005).

These cases give effect to the Supreme Court's admonition that:

> [T]he sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . . .

*Alden v. Maine*, 527 U.S. 706, 713 (1999).

There are fleeting suggestions to the contrary in Supreme Court authority, but none of them compel the opposite conclusion. Most recently, in *Knick v. Twp. of Scott*, 139 S. Ct. at 2162 (2019), the Supreme Court cast doubt on the notion

that the availability of state-law relief should determine whether federal courts may hear takings claims. *Id.* at 2169-71 (stating that the existence of a state-law remedy "cannot infringe or restrict the property owner's federal constitutional claim," and that to hold otherwise would "hand[] authority over federal takings claims to state courts") (internal quotations omitted). Similarly, in *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304 (1987), the Supreme Court rejected an argument that, based on the "prohibitory nature of the Fifth Amendment, . . . combined with principles of sovereign immunity," the Takings Clause is merely a "limitation on the power of the Government to act," rather than a "remedial provision" that requires compensation. *Id.* at 316 n.9.[6]

But these cases do not control here. They establish, at most, that the Takings Clause can overcome *court-imposed* — rather than constitutional — restrictions on takings claims. *See Knick*, 139 S. Ct. 2167-68 (overruling *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172

[6] Some have argued that this footnote proves the Takings Clause trumps sovereign immunity, insofar as it suggests sovereign immunity does not strip the Takings Clause of its remedial nature. *See, e.g.*, Eric Berger, *The Collision of the Takings and State Sovereign Immunity Doctrines*, 63 WASH. & LEE L. REV. 493 (2006). But that reading is far from obvious, and it would, in any event, be dictum (because the defendant in *First English* was a county, which cannot invoke sovereign immunity).

(1985), which had established court-imposed rule requiring plaintiffs to exhaust state remedies before bringing a takings claim in federal court); *First English*, 482 U.S. at 310-11 (invalidating state precedent that prevented plaintiffs from recovering compensation for damages incurred before a state court found there was a taking). Neither case had occasion to decide whether the Takings Clause overrides other constitutional provisions like the Eleventh Amendment. *Knick* and *First English*, therefore, do not compel the conclusion that the Takings Clause trumps sovereign immunity.

Accordingly, New York State, the DHCR,[7] and Commissioner Visnauskas (to the extent Plaintiffs seek monetary relief in her official capacity) will be dismissed from this litigation.

This holding may not have the profound impact that one might initially surmise. Plaintiffs may continue to seek prospective remedies — like an injunction — against state officials under *Ex Parte Young*, 209 U.S. 123 (1908), and New York State remains obligated (via its own consent) to pay just

[7] Sovereign immunity extends to state agencies like the DHCR as well, because they are an arm of the state. *See, e.g.*, *Schiavone v. N.Y. State Office of Rent Admin.*, No. 18-cv-130, 2018 WL 5777029, at *3-*4 (S.D.N.Y. Nov. 2, 2018) (Eleventh Amendment bars suit against DHCR); *Helgason v. Certain State of N.Y. Emps.*, No. 10-cv-5116, 2011 WL 4089913, at *7 (S.D.N.Y. June 24, 2011) (same) *report and recommendation adopted sub nom. Helgason v. Doe*, 2011 WL 4089943 (S.D.N.Y. Sept. 13, 2011); *Gray v. Internal Affairs Bureau*, 292 F. Supp. 2d 475, 476 (S.D.N.Y. 2003) (same).

compensation for takings under the New York State Constitution. Moreover, the Eleventh Amendment does not affect Plaintiffs' claims for money damages against the City of New York, the RGB, or the members of the RGB.

Sovereign immunity also does not bar the remaining damages claims (for just compensation) against Commissioner Visnauskas in her individual capacity.[8] But to establish individual liability, Plaintiffs must allege that Commissioner Visnauskas was "personal[ly] involve[d]" in the alleged regulatory takings. *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Although Plaintiffs allege that Commissioner Visnauskas is personally responsible for enforcing and implementing particular aspects of the RSL,[9] the core of their claims is that the *enactment* of the 2019 amendments, as a whole, violates the Constitution. Because they do not allege that Commissioner Visnauskas had any involvement at that broader stage, these claims must be dismissed under Rule 12(b)(6). *See*

---

[8] Moreover, the Eleventh Amendment does not bar Plaintiffs' Contracts Clause claims against Commissioner Visnauskas for declaratory relief (in her official capacity) or for damages (in her personal capacity). As explained below, those claims are dismissed on the merits, as are Plaintiffs' due-process claims against Commissioner Visnauskas for facial declaratory and injunctive relief.

[9] Plaintiffs allege that Commissioner Visnauskas was personally "charged with implementing and enforcing" certain provisions of the RSL, including the personal-use restrictions and the MCI and IAI provisions. Pinehurst Complaint at ¶¶ 68, 127, ECF No. 1 (Pinehurst Compl.) (citing N.Y.C. Admin. Code § 26-511(b) ("[N]o such amendments shall be promulgated except by action of the commissioner of the division of housing and community renewal").

*Morabito*, 803 F. App'x at 466 (allegation that state official could "modify or abolish" the challenged regulation was inadequate); *Nassau & Suffolk Cnty. Taxi Owners Ass'n, Inc. v. New York*, 336 F. Supp. 3d 50, 70 (E.D.N.Y. 2018) (dismissing claim because plaintiffs did not allege that the officials were "involved in the creation or passage" of the challenged regulation). Commissioner Visnauskas is not completely dismissed from this action, however, because Plaintiffs' surviving claims against her for declaratory relief may proceed under *Ex Parte Young*.

* * * * *

The Court turns next to Plaintiffs' substantive claims. Plaintiffs bring two types of challenge under the Takings Clause — they allege physical and regulatory takings. The CHIP Plaintiffs allege only facial challenges under both theories (*i.e.*, they claim that the face of the statute effectuates a physical and regulatory taking in all applications). Certain Pinehurst Plaintiffs also bring as-applied takings challenges with respect to specific properties under both theories.

B. <u>Physical Taking: Facial and As-Applied Challenges</u>

When a government authorizes "a permanent physical occupation" of property, a taking occurs. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982).

Physical takings are characterized by a deprivation of the "entire bundle of property rights" in the affected property interest — "the rights to possess, use and dispose of" it. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 361-62 (2015) (quoting *Loretto*, 458 U.S. at 435) (internal quotations omitted). Examples include the installation of physical items on buildings, *Loretto*, 458 U.S. at 438, and the seizure of control over private property, *Horne*, 576 U.S. at 361-62 (crops); *United States v. Pewee Coal Co.*, 341 U.S. 114, 115-17 (1951) (mines).

In this case, all Plaintiffs retain the first and third strands in *Horne*'s bundle of rights, *supra*: they continue to possess the property (in that they retain title), and they can dispose of it (by selling). *See Andrus v. Allard*, 444 U.S. 51, 65-66 (1979) ("[W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety."). The restrictions on their right to use the property as they see fit may be significant, but that is insufficient under the standards set forth by the Supreme Court and Second Circuit to make out a physical taking.

Recognizing as much in prior cases, the Second Circuit has held that "the RSL regulates land use rather than effecting a physical occupation." *W. 95 Hous. Corp. v. N.Y.C. Dep't of Hous. Pres. & Dev.*, 31 F. App'x 19, 21 (2d Cir. 2002) (summary

order) (citing *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992)). The Circuit has rejected physical-takings claims against the RSL on multiple occasions. *See Harmon v. Markus*, 412 F. App'x 420 (2d Cir. 2011) (summary order); *Greystone Hotel Co. v. City of New York*, 98-9116, 1999 U.S. App. LEXIS 14960 (2d Cir. June 23, 1999) (summary order); *FHLMC*, 83 F.3d at 47-48. The incremental effect of the 2019 amendments, while significant to investment value, personal use, unit deregulation, and eviction rights, is not so qualitatively different from what came before as to permit a different outcome.

Plaintiffs attempt to overcome these Second Circuit cases by arguing that they rest in part on reasoning that the Supreme Court has since disparaged in *Horne*. In *Harmon* and *FHLMC*, the Second Circuit had invoked what Plaintiffs here call the "acquiescence theory" — the notion that the landlords chose, voluntarily, to enter the rental real estate business, and that they can exit it if they choose. In *Horne*, decided subsequently, this strain of reasoning came under criticism. *See Horne*, 576 U.S. at 365 (rejecting argument that "raisin growers voluntarily choose to participate in the raisin market" and could leave the industry to escape regulation); *see also Loretto,* 458 U.S. at 439 n.17 (noting that "a landlord's ability to rent his property may not be conditioned on forfeiting the right to compensation for a physical occupation"). But *Horne's*

rejection of "acquiescence" theory does not save Plaintiffs' physical-takings claim. Plaintiffs' argument fails not because they have acquiesced in the taking of their property, but because under cases like *Loretto*, *Horne*, *Yee*, and others, no physical taking has occurred in the first place.

The Pinehurst Plaintiffs' as-applied physical challenges fail for the same reasons (to the extent they make them, which 177 Wadsworth LLC does not). No Plaintiff alleges that they have been deprived of title to their property, or that they have been deprived of the ability to sell the property if they choose. At most, these Plaintiffs allege that the manner in which they can remove apartments from stabilization — the so-called "off ramps" from the RSL regime — have been significantly limited.

Accordingly, the Court finds that Plaintiffs fail to state physical-taking allegations upon which relief can be granted, and dismisses these claims — both facial and as-applied — pursuant to Rule 12(b)(6).

C. Regulatory Taking – Facial Challenge

Like the physical-takings challenges, every regulatory-takings challenge to the RSL has been rejected by the Second Circuit. *See W. 95 Hous. Corp.*, 31 F. App'x 19 (summary order); *Greystone Hotel Co.*, 1999 U.S. App. LEXIS 14960 (summary order); *FHLMC*, 93 F.3d 45; *see also Rent Stabilization Ass'n v.*

*Dinkins*, 5 F.3d 591, 595 (2d Cir. 1993) (construing plaintiff's facial attacks as as-applied challenges and dismissing them for lack of standing). Of course, it cannot be said that there is no such thing as a regulatory taking in the world of rent stabilization, and it remains eminently possible that at some point, the legislature will apply the proverbial straw that breaks the camel's back.[10] If they do, however, it is unlikely that the straw in question will be identified in the context of a facial challenge. In *Pennell v. City of San Jose*, 485 U.S. 1 (1988), for example, the Supreme Court rejected a regulatory-takings claim, noting that "we have found it particularly important in takings cases to adhere to our admonition that 'the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary.'" *Id.* at 10 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 294-95 (1981)); *see also Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978) (regulatory-takings analyses are "essentially ad hoc, factual inquiries"). The Second Circuit has repeatedly

[10] The Supreme Court has spoken about the need for takings jurisprudence to redress this kind of incremental deprivation of property rights. *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) ("If . . . the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature would be to extend the qualification more and more until at last private property disappeared.'") (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

disparaged facial challenges to the RSL. *See W. 95 Hous. Corp.*, 31 F. App'x at 21 (the difficulty of regulatory-takings analysis "suggests that a widely applicable rent control regulation such as the RSL is not susceptible to facial constitutional analysis under the Takings Clause"); *Dinkins*, 5 F.3d at 595 (trade association's challenge was "simply not facial," despite plaintiff's having characterized it as such, and "the proper recourse is for the aggrieved individuals themselves to bring suit" on an as-applied basis). This is consistent with limitations on facial challenges generally. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990) (noting that outside of the First Amendment context, "facial challenges to legislation are generally disfavored").

In a facial challenge, Plaintiffs must demonstrate that "no set of circumstances exists under which [the RSL] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Put differently, such a claim fails if Defendants can identify any "possible set of . . . conditions" under which the RSL could be validly applied. *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987).

The Supreme Court has identified two distinct strains of regulatory-takings analysis. The first applies in the case of a regulation that "denies all economically beneficial or productive use of land." *Palazzolo v. Rhode Island*, 533 U.S.

606, 617 (2001); *see also Lucas*, 505 U.S. at 1026 (applying the "categorical rule that total regulatory takings must be compensated"). This analysis is inapplicable here: Plaintiffs do not allege that they have been deprived of *all* economically viable use of their property.[11]

Even without rendering property worthless, a regulatory scheme may still effectuate a taking if it "goes too far," in Justice Holmes's words. *Mahon*, 260 U.S. at 415. In the current era, courts apply the three-factor test of *Penn Central* to determine whether a regulation that works a less-than-total destruction of value has gone too far. The factors are: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with reasonable investment-backed expectations; and (3) the character of the governmental action in question. *See Penn Central*, 438 U.S. at 124. In applying these factors, the ultimate question is "whether justice and fairness require that economic injuries

---

[11] Pinehurst Compl. at ¶ 216 ("The RSL thus results in a decrease of 50 percent or more of a unit's value. The 2019 Amendments exacerbate this decrease in value and have caused rent-stabilized apartments to lose 20 to 40 percent (or more) of their value prior to enactment of the 2019 Amendments."); *id.* at ¶ 97 (the 2019 amendments "have reduced the value of the rent-stabilized buildings owned by Plaintiffs 74 Pinehurst LLC, 141 Wadsworth LLC, [and] 177 Wadsworth LLC . . . by 20 to 40 percent"); *id.* at ¶ 232 (the RSL has "decreas[ed] the resale value of Plaintiffs' properties"); CHIP Complaint at ¶ 274, ECF No. 1 (CHIP Compl.) ("The RSL's regulatory burdens have dramatically reduced the market value of regulated properties, in some cases by over 50%"); *id.* at ¶ 298 ("[B]uildings where rent stabilized units account for almost 100% of the units can expect a price per square foot . . . of two-thirds less" than buildings where "0-20% of the units" are regulated).

caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979) (internal quotations omitted). The Court considers the *Penn Central* factors as they apply, first, to Plaintiffs' facial challenge, and then to the as-applied regulatory challenges, which are discussed in a separate section, *infra*.

Simply to apply these "ad hoc" factors to the instant *facial* challenge is to recognize why the RSL is not generally susceptible to such review. The first factor — economic impact — obviously needs to be calculated on an owner-by-owner basis, and those calculations will vary significantly depending on when a property was purchased, what fraction of its units are rent-stabilized, what improvements the landlord has made, and many other metrics. At best, Plaintiffs can make vague allegations about the average diminution in value across regulated properties. *See, e.g.*, Transcript dated June 23, 2020 at 59:19-24, *Community Housing Improvement Program v. City of New York*, 19-cv-4087, ECF No. 86 ("[CHIP Plaintiffs' counsel]: . . . . At the complaint stage, we don't have to have developed all of our evidence, even our own evidence, with respect to the

economic impact.”).[12] This lack of clarity surely arises because the diminution in value will vary significantly from property to property — making it virtually impossible to show there is “no set of circumstances,” *Salerno*, 481 U.S. at 745, in which the RSL applies constitutionally.

The second *Penn Central* factor is the extent to which the regulation interferes with reasonable investment-backed expectations. “The purpose of the investment-backed expectation requirement is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.” *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (internal quotations omitted). Accordingly, the nature of each landlord’s investment-backed expectations depends on when they invested in the property and what they expected at that time. *Meridien Tr. & Safe Deposit Co. v. FDIC*, 62 F.3d 449, 454 (2d Cir. 1995) (“[T]he critical time for considering investment-backed expectations is the time a property is acquired, not the time the challenged regulation is enacted.”). And the reasonableness

---

[12] *See also* Pinehurst Compl. at ¶ 94 (comparing the average “value per square foot” of regulated and unregulated buildings); *id.* at ¶ 101 (comparing landlords’ average “operating costs” and “permitted [rate] increases”); CHIP Compl. at ¶ 273 (regulated units charge “on average 40% lower than market-rate rents, and in some units 80% lower”); *id.* at ¶ 274 (“unregulated properties are typically worth 20% to 40% more” than regulated ones), *id.* at ¶ 284 (“the income from non-regulated units can be as much as 60-90% higher than regulated units”).

of these expectations will of course vary based on the state of the law when the property was purchased, among other things. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (the expectation must be "reasonable," which means it "must be more than a unilateral expectation or an abstract need") (internal quotations omitted); *see also Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 36-37 (1st Cir. 2002) (courts "should recognize that not every investment deserves protection and that some investors inevitably will be disappointed").

Plaintiffs cannot make broadly applicable allegations about the investment-backed expectations of landlords state- or city-wide. Different landlords bought at different times, and their "reliance," such as it was, would have been on different incarnations of the RSL. *See Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 38 (2012) (noting that the reasonable investment-backed expectations analysis is "often informed by the law in force" at the time). Even those who bought at the same time would have done so with different expectations, including some the law still allows. Given this range of expectations — some reasonable, others not — Plaintiffs cannot allege that the RSL frustrates the reasonable investment-backed expectations of every landlord it affects.

Finally, *Penn Central*'s third factor considers the "character of the taking." *See Penn Central*, 438 U.S. at 124

("A taking may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.") (internal citations omitted). But Plaintiffs cannot prevail without alleging the other two *Penn Central* factors at the facial level. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005) ("[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests."). Accordingly, Plaintiffs' facial regulatory-takings claim is dismissed.

D. Post-Breach Relief Provisions

The RSL provisions that provide the most substantial basis for a facial challenge, in this Court's estimation, are contained in New York's Real Property Actions and Proceedings Law (RPAPL) Sections 749 and 753. As amended in 2019, these provisions dictate that even after the RSL has operated to eliminate "unjust, unreasonable and oppressive rents," N.Y.C. Admin. Code § 26-501, the state housing courts may still stay (for up to twelve months) the eviction of a tenant who fails to pay the reduced rent, if eviction would cause the tenant "extreme hardship." RPAPL § 753. In making the hardship

determination, "the [housing] court shall consider serious ill health, significant exacerbation of an ongoing condition, a child's enrollment in a local school, and any other extenuating life circumstances affecting the ability of the applicant or the applicant's family to relocate and maintain quality of life." *Id.*

These "post-breach relief" provisions are aimed at requiring particular property owners to alleviate the hardships of particular tenants — including hardships that may arise from circumstances separate and distinct from the dynamics of supply and demand in New York's rental housing market. That aim, while indisputably noble, nevertheless carries a "heightened risk that private property is being pressed into some form of public service," *Lucas*, 505 U.S. at 1018, and correspondingly puts more pressure on the "usual assumption that the legislature is simply adjusting the benefits and burdens of economic life" in a way that requires no recompense. *Id.* at 1017 (internal quotations omitted). Stated in terms of the current case, it can be argued that in Sections 749 and 753, the New York State legislature is not "adjusting" the terms of a contract between landlord and tenant in a regulated market, but rather drafting a landlord who is no longer subject to *any enforceable contract* at all (because the tenant is in breach) to provide an additional benefit — of

up to one year's housing — because of the specific tenant's life circumstances.

Neither the Supreme Court nor the Second Circuit has squarely considered a regulation like the post-breach relief provisions here, but the Supreme Court came closest in *Pennell*, which also involved a statute that called on landlords to provide additional benefits on the basis of tenant "hardship." 485 U.S. 1. The City of San Jose had adopted a rent-control ordinance listing seven factors that a "hearing officer" was required to consider in determining the rent that a particular landlord could charge. *Id.* at 9. The Court described the argument that the seventh factor — the "hardship" factor — worked a taking:

> [T]he Ordinance establishes the seven factors that a hearing officer is to take into account in determining the reasonable rent increase. The first six of these factors are all objective, and are related either to the landlord's costs of providing an adequate rental unit, or to the condition of the rental market. Application of these six standards results in a rent that is "reasonable" by reference to what appellants contend is the only legitimate purpose of rent control: the elimination of "excessive" rents caused by San Jose's housing shortage. When the hearing officer then takes into account "hardship to a tenant" pursuant to [the seventh factor] and reduces the rent below the objectively "reasonable" amount established by the first six factors, this additional reduction in the rent increase constitutes a "taking." This taking is impermissible because it does not serve the purpose of eliminating excessive rents — that objective has already

> been accomplished by considering the first six factors — instead, it serves only the purpose of providing assistance to "hardship tenants."

*Id.*

In response to this argument, Justice Scalia would have held that a facial taking occurred. He concluded that in any application of the "hardship" provision, the city would not be "'regulating' rents in the relevant sense of preventing rents that are excessive; rather, it [would be] using the occasion of rent regulation (accomplished by the rest of the Ordinance) to establish a welfare program privately funded by those landlords who happen to have 'hardship' tenants." *Id.* at 22 (Scalia, J., concurring in part and dissenting in part).

A broad majority of the Court, however, declined to reach the facial-takings question, on the basis that it would have been "premature" to do so without record evidence that the hardship provision had ever actually been relied on to reduce a proposed rent increase. *Id.* at 9-10. The majority noted that there was nothing in the law *requiring* the hearing officer to reduce rents on the basis of tenant hardship, and that the Court therefore lacked a "sufficiently concrete factual setting for the adjudication of the takings claim" presented. *Id.*

Applying *Pennell*'s reasoning, the facial challenge to the post-breach relief provisions here, too, must be deemed premature. Though Plaintiffs allege that application of the

post-breach relief provisions is “far from uncommon,” CHIP Plaintiffs’ Supplemental Memorandum of Law in Opposition to Defendants’ and Intervenors’ Motions to Dismiss at 11, ECF No. 87 (quoting *Elmsford Apartment Assocs. v. Cuomo*, 20-cv-4062, 2020 WL 3498456, at *4 (S.D.N.Y. June 29, 2020)), they do not argue that any named Plaintiff in this case has been harmed by application of these provisions.

And the parties do not agree on how the provisions are likely to work in practice. Plaintiffs contend that the statutory provision conditioning stays on the tenant depositing rent payments is illusory because the statute provides no “enforcement mechanism” to force tenants to pay, *see* Pinehurst Plaintiffs’ Supplemental Brief in Opposition to Defendants’ Motions to Dismiss at 3, ECF No. 65 (“Although the statute purports to require a deposit of one year’s rent as a condition of the tenant’s post-breach occupancy, the statute contains *no* enforcement mechanism through which a property owner can require the tenant to make that deposit.”). Defendants argue, however, that state courts do, in fact, enforce this requirement in practice, *see, e.g.*, Pinehurst City Defendants’ Supplemental Brief in Further Support of Their Motion to Dismiss the Complaint at 3, 5-7, ECF No. 68. Given these factual disputes, the Court must heed the *Pennell* majority’s admonition to avoid decision until the provision is challenged in a “factual setting

that makes such a decision necessary." 485 U.S. at 10 (quoting *Hodel*, 452 U.S. at 294-95).

E. Regulatory Taking – As-Applied Challenge

Even in bringing their as-applied challenges, the Pinehurst Plaintiffs (except 177 Wadsworth LLC) must "satisfy the heavy burden placed upon one alleging a regulatory taking." *Keystone Bituminous Coal Ass'n,* 480 U.S. at 493. But taking their allegations as true, certain as-applied Plaintiffs have alleged enough to survive a motion to dismiss. Indeed, there are unanswered questions about virtually every aspect of their claims.

Applying the first *Penn Central* factor, each as-applied Plaintiff alleges that the 2019 amendments significantly diminished the value of their properties. While the extent of this diminution remains to be determined with precision, Plaintiffs 74 Pinehurst LLC and 141 Wadsworth LLC allege that the 2019 amendments reduced the value of their regulated properties by twenty to forty percent *beyond* the diminution already occasioned by the pre-2019 RSL. Pinehurst Compl. at ¶ 97. And Eighty Mulberry Realty Corporation and the Panagouliases allege that the 2019 amendments "significantly reduced the value" of their rent-stabilized apartments, *id.* at ¶ 96, which now rent for roughly half the rate of unregulated apartments in the same building (or less), *id.* at ¶ 106. These

alleged economic impacts, though insufficient *on their own*,[13] are not so minimal to compel dismissal of the complaint at this stage.

But only two Plaintiffs (Eighty Mulberry Realty Corporation and the Panagouliases) adequately allege that the RSL violates their reasonable investment-backed expectations in its current cumulative effect. These Plaintiffs bought their properties at the dawn of the rent-stabilized era — either before the RSL was first enacted (Eighty Mulberry Realty Corporation, before 1950, *id.* at ¶ 17) or not long thereafter (the Panagouliases, in 1974, *id.* at ¶ 13). And they allege that the 2019 amendments not only frustrate their expectation to a reasonable rate of return, but also their expectation that some units would not be (or remain) regulated at all. *Id.* at ¶¶ 108-09.[14] The Panagouliases contend that the DHCR rejected

---

[13] *See Penn Central*, 438 U.S. at 131 (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) (75% diminution in value not a taking); *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (87.5% diminution; same conclusion)); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 645 (1993) ("[M]ere diminution in the value of property, however serious, is insufficient to demonstrate a taking.").

[14] "The 2019 Amendments further undermine the investment-backed expectations of property owners, including Plaintiffs [the Panagouliases] and Plaintiff Eighty Mulberry [Realty] Corporation, by repealing the luxury- and high-income decontrol provisions described above . . . . Many property owners, including Plaintiffs [the Panagoluiases] and Plaintiff Eighty Mulberry Realty Corporation, undertook significant capital improvements, improving the quality of their units, with the expectation that the apartments could be converted to market-rate rentals under the luxury- and high-income decontrol provisions. Repeal of the luxury- and high-income

their attempt to reclaim units for personal use, which effectively prevents them from using the property for other purposes. *Id.* at ¶¶ 63-64.[15] Although questions remain as to the nature and reasonableness of these expectations, it cannot be said, at this stage, that these allegations are inadequate. Discovery is needed to assess these claims.

The same is not true for the other as-applied Plaintiffs, 74 Pinehurst LLC and 141 Wadsworth LLC. Unlike Eighty Mulberry Realty Corporation and the Panagouliases, these Plaintiffs bought their properties under a different, and more mature, version of the RSL (as in effect in 2003 and 2008, respectively, *see id.* at ¶¶ 14-15).[16] By that point, the RSL had

---

decontrol provisions eliminated the only mechanisms to transition a rent-stabilized apartment into a market-rate rental unit. . . . The luxury and high-income decontrol provisions had been the law for over 25 years, and formed the backbone of property owners' reasonable investment-backed expectations that they could eventually charge market rents for their units." Pinehurst Compl. at ¶¶ 108-09.

[15] *Cf. Yee*, 503 U.S. at 528 (noting that those plaintiffs, unlike the Panagouliases, had failed to run the "gauntlet" of statutory procedures for changing the use of their property prior to bringing their takings claim). The Panagouliases also allege that they cannot put the property to commercial use due to zoning laws. *See* Pinehurst Compl. at ¶ 87.

[16] Whether the time of acquisition matters to the *Penn Central* inquiry appears to be subject to some debate among the Justices. *See Palazzolo*, 533 U.S. at 630 (*Penn Central* claims are "not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction"); *id.* at 637 (Scalia, J., concurring) ("In my view, the fact that a restriction existed at the time the purchaser took title . . . should have no bearing upon the determination of whether the restriction is so substantial as to constitute a taking."). But for the moment, at least, the timing of purchase — even if not dispositive, in and of itself — remains at least significant, and the as-applied Plaintiffs here have very different purchase profiles in that regard. *See id.* at 633, 635 (O'Connor, J., concurring) (the *Palazzolo* majority's holding "does not mean that the timing of the regulation's

taken its basic shape and become a fixture of New York law.[17] *Cf.* CHIP Compl. at ¶ 303 (the RSL was "nominally established as a temporary measure").

74 Pinehurst LLC and 141 Wadsworth LLC argue that they did not reasonably expect operating costs to outpace rate increases. Pinehurst Compl. at ¶¶ 98, 101, 237. Nor, these Plaintiffs claim, did they expect the repeal of luxury decontrol or vacancy, longevity, and preferential-rate increases, *id.* at ¶¶ 102, 104, 114, 120, 124, or the reduction of recoverable IAIs and MCIs, *id.* at ¶¶ 138-42.

But by the time these Plaintiffs invested, the RSL had been amended multiple times, and a reasonable investor would have understood it could change again. Under the Second Circuit's case law, it would not have been reasonable, at that point, to expect that the regulated rate would track a given figure, or that the criteria for decontrol and rate increases would remain static. *See, e.g.*, *id.* at ¶¶ 22, 99-100 (RGB sets

---

enactment relative to the acquisition of title is immaterial to the *Penn Central* analysis," and "does not remove the regulatory backdrop against which an owner takes title to property from the purview of the *Penn Central* inquiry"); *1236 Hertel Ave. v. Calloway*, 761 F.3d 252, 266-67 (2d Cir. 2014) (dismissing, despite *Palazzolo*, a *Penn Central* claim because plaintiff acquired title after the challenged law became a "background principle of the State's law of property," which made his expectation that the law would not change unreasonable).

[17] There were some background rent-regulation laws when Eighty Mulberry Realty Corporation and the Panagouliases bought their properties as well. As stated above, some form of rent regulation has existed in New York City since World War I. But these were very different regimes, and it is unclear whether and to what extent they applied to the properties at issue here.

permissible rates annually based on the rent set under the RSL in 1974); *id.* at ¶ 38 (luxury-decontrol introduced in 1993); CHIP Compl. at ¶ 59 (vacancy and longevity increases introduced in 1997); Memorandum of Law in Support of Pinehurst State Defendants' Motion to Dismiss at 8, ECF No. 53 (luxury-decontrol amended in 1997). Because these Plaintiffs made their investments "against a backdrop of New York law" that suggested the RSL could change, *see 1236 Hertel Ave.*, 761 F.3d at 266-67, they cannot allege that the 2019 amendments violated their *reasonable* investment-backed expectations.

Finally, analysis of the RSL's "character" should be determined after discovery, when the precise effects of the RSL on these Plaintiffs becomes clearer.

The claims brought by 74 Pinehurst LLC and 141 Wadsworth LLC are therefore dismissed, while the claims brought by Eighty Mulberry Realty Corporation and the Panagouliases may proceed.

F. Due Process

Nor do the 2019 amendments violate the Due Process Clause of the Fourteenth Amendment. Plaintiffs argue that the RSL is not "rationally related" to increasing the supply of affordable housing, helping low-income New Yorkers, or promoting socio-economic diversity. Instead, they claim the law is counterproductive: it *perpetuates* New York's housing crisis,

and fails to target the people it claims to serve. *See* CHIP Compl. at ¶¶ 70-155; Pinehurst Compl. at ¶¶ 159-88. The CHIP Plaintiffs also argue that New York City's triennial declaration of a "housing emergency" (which triggers the RSL) itself violates due process, because that decision is arbitrary and irrational. CHIP Compl. at ¶¶ 167-92.

In support, Plaintiffs allege that economists broadly agree that laws like the RSL do not work for their intended purpose, and indeed may do substantially more harm than good. As one Nobel Prize-winning economist, cited in the Pinehurst Plaintiffs' complaint, put it in discussing San Francisco's rent-stabilization scheme:

> The analysis of rent control is among the best-understood issues in all of economics, and — among economists, anyway — one of the least controversial. In 1992 a poll of the American Economic Association found 93 percent of its members agreeing that "a ceiling on rents reduces the quality and quantity of housing." Almost every freshman-level textbook contains a case study on rent control, using its known adverse side effects to illustrate the principles of supply and demand. Sky-high rents on uncontrolled apartments, because desperate renters have nowhere to go — and the absence of new apartment construction, despite those high rents, because landlords fear that controls will be extended? Predictable. . . . [S]urely it is worth knowing that the pathologies of San Francisco's housing market are right out of the textbook, that they are exactly what supply-and-demand analysis predicts.

Paul Krugman, *Reckonings; A Rent Affair*, N.Y. TIMES (June 7, 2000); *see also* Pinehurst Compl. at ¶ 160 (citing Krugman article).

But the Court is engaged in rational-basis review here, not strict scrutiny. *See Pennell*, 485 U.S. at 11-12 (considering whether a rent-control statute was "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt"); see *also Lingle*, 544 U.S. at 545 ("[W]e have long eschewed . . . heightened scrutiny when addressing substantive due process challenges to government regulation"). And in that context, the Court is bound to defer to legislative judgments, even if economists would disagree. *See, e.g.*, *Lingle*, 544 U.S. at 544-45 (disapproving of district court's assessment of competing expert testimony on the benefits of Hawaii's rent-control statute, and stating: "The reasons for deference to legislative judgments about the need for, and likely effectiveness of, regulatory actions are by now well established . . . .").

Moreover, alleviating New York City's housing shortage is not the only justification of the RSL that the legislature offered. The RSL was also intended to allow people of low and moderate income to remain in residence in New York City — and specific neighborhoods within — when they otherwise might not be able to. *See* N.Y.C. Admin. Code § 26-501 (extending the RSL to prevent "uprooting long-time city residents from their communities"). The Supreme Court has recognized neighborhood stability and continuity as a valid basis for government

regulation. *See Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992) ("[T]he State has a legitimate interest in local neighborhood preservation, continuity, and stability.") (citing *Village of Euclid*, 272 U.S. 365). And where, as here, there are multiple justifications offered for regulation, the statute in question must be upheld so long as any one is valid. *See Preseault v. I.C.C.*, 494 U.S. 1, 18 (1990) ("There is no requirement that a law serve more than one legitimate purpose."); *Thomas v. Sullivan*, 922 F.2d 132, 136 (2d Cir. 1990) (on rational-basis review, "we consider not only contemporaneous articulations of legislative purpose but also any legitimate policy concerns on which the legislature might conceivably have relied"). Accordingly, the due-process challenge is dismissed.

G. Contracts Clause

The Pinehurst Plaintiffs also claim that the 2019 amendments, as applied to each of them, violate the Contracts Clause of Article I by repealing the RSL's so-called "preferential rates" provision.[18] This provision allowed landlords to raise rents on an expiring lease to the maximum rate that would otherwise apply to the unit. While the preferential-rates provision existed, many landlords, including each of the Plaintiffs here, Pinehurst Compl. at ¶ 120,

[18] The Contracts Clause prohibits states from "pass[ing] any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1.

allegedly offered "preferential" leases to tenants (*i.e.*, leasing rates discounted below even what the RGB would permit). These landlords expected, prior to repeal, that they could raise rates significantly when a preferential lease term ended. The 2019 amendments, however, prevent Plaintiffs from doing so by limiting future rates to the amount charged at the time the 2019 amendments were enacted (plus annual increases). *See* N.Y. Reg. Sess. § 6458, Part E, § 2 (2019).

Plaintiffs claim this violates the Contracts Clause in two ways. First, they claim that it extends the duration of all Plaintiffs' expiring, preferential leases (since now they must not only renew the lease, but also at the same preferential rates). Second, 74 Pinehurst LLC claims that, as to it, the 2019 amendments also required the *retroactive* reduction of rent — the most important term in the lease — in two particular lease agreements that it had executed before the amendment passed.

Plaintiffs' first claim — that the 2019 amendments revise the duration of their expiring leases — is unavailing. As applied to future renewals, "[a] contract . . . cannot be impaired by a law in effect at the time the contract was made." *Harmon*, 412 F. App'x at 423. Future leases will be subject to the 2019 amendments from the onset. *See 2 Tudor City Place Assocs. v. 2 Tudor City Tenants Corp.*, 924 F.2d 1247, 1254 (2d Cir. 1991) ("Laws and statutes in existence at the time a

contract is executed are considered a part of the contract, as though they were expressly incorporated therein.”).

74 Pinehurst LLC, however, also alleges that the 2019 amendments revised the terms of two of its *already* executed leases. In resolving this claim, the Court must ask three questions: “(1) is the contractual impairment substantial and, if so, (2) does the law serve a legitimate public purpose such as remedy a general social or economic problem and, if such purpose is demonstrated, (3) are the means chosen to accomplish this purpose reasonable and necessary[?]” *Buffalo Teachers Fed’n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006). As explained below, 74 Pinehurst LLC’s claim falters at stages two and three.

74 Pinehurst LLC adequately alleges that the 2019 amendments “substantially impair” its executed leases by affecting a critical term of their executed lease agreements — the monthly rent. *Cf. id.* at 368 (wage freeze substantially impaired unions’ labor contracts because compensation is “the most important element[] of a labor contract”). But 74 Pinehurst LLC cannot surmount the second and third steps of the Contracts Clause analysis. The legislative purposes behind the RSL are valid (as explained above). *See Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998); *see also Marcus Brown Holding Co v. Feldman*, 256 U.S. 170, 198-99 (1921); *Brontel, Ltd. v. City of New York*, 571 F.Supp. 1065,

1072 (S.D.N.Y. 1983). And where, as here, the affected contract is between private parties, courts must "accord substantial deference" to the legislature's conclusions about how to effectuate those purposes. *Buffalo Teachers*, 464 F.3d at 369; *see also Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 994 (2d Cir. 1997). For the reasons articulated above in Section F (Due Process), the RSL passes muster under this deferential standard. 74 Pinehurst LLC's Contracts Clause claims are, therefore, dismissed.

**III. Conclusion**

For the reasons explained above, the Court grants Defendants' motions to dismiss all claims in *Community Housing Improvement Program v. City of New York* (19-cv-4087). The Court also grants Defendants' motions to dismiss all claims in *74 Pinehurst LLC v. State of New York* (19-cv-6447) except the as-applied regulatory-takings claims brought by Eighty Mulberry Realty Corporation and the Panagouliases. The Pinehurst Plaintiffs' claims against the State of New York and the DHCR are dismissed for lack of subject-matter jurisdiction, as are their claims for damages against DHCR Commissioner Visnauskas in

her official capacity. The Clerk of Court is respectfully directed to enter judgment and close the action in *CHIP* (19-cv-4087), given that that action is now dismissed in its entirety.

SO ORDERED.

/s Eric Komitee
ERIC KOMITEE
United States District Judge

Dated: Brooklyn, New York
September 30, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x

74 PINEHURST LLC, 141 WADSWORTH LLC, 177 WADSWORTH LLC, DINO PANAGOULIAS, DIMOS PANAGOULIAS, et al.,

Plaintiffs,

-against-

STATE OF NEW YORK, NEW YORK DIVISION OF HOUSING AND COMMUNITY RENEWAL, RUTHANNE VISNAUSKAS, et al.,

Defendants.

-------------------------------------------x

**MEMORANDUM AND ORDER**
19-cv-6447(EK)(RLM)

ERIC KOMITEE, United States District Judge:

After the Court dismissed all claims in this action except the as-applied regulatory-taking claims brought by Plaintiffs Eighty Mulberry Realty Corporation and Dino, Dimos, and Vasiliki Panagoulias, ECF No. 79, Plaintiffs moved for entry of final judgment under Rule 54(b) of the Federal Rules of Civil Procedure as to 177 Wadsworth LLC, the one Plaintiff in this action who did not raise as-applied takings claims. ECF 81. In the alternative, Plaintiffs seek entry of final judgment as to the facial claims brought by all Plaintiffs under the Takings and Due Process Clauses. *Id.* Plaintiffs argue that final judgment should be entered because the relevant claims raise identical issues to the ones in CHIP's pending appeal. *See* No. 20-3366 (2d Cir.).

However, "the entry of a final judgment is generally appropriate only after all claims have been adjudicated." *Novick v. AXA Network*, 642 F.3d 304, 310 (2d Cir. 2011) (internal quotations omitted). Accordingly, the power to "enter [] a final judgment before the entire case is concluded" should "be exercised sparingly." *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 629 (2d Cir. 1991). Plaintiffs chose to pursue a joint action, with 177 Wadsworth LLC bringing suit together with parties that raised as-applied takings claims. There is no "injustice" in enforcing the consequences of that decision, nor would there be meaningful gains to "judicial administration and efficiency" by allowing this action to be appealed in piecemeal fashion. *Hogan v. Consolidated Rail Corp.*, 961 F.2d 1021, 1025 (2d Cir. 1992) (internal quotations omitted).

Accordingly, Plaintiffs' motion for entry of judgment under Rule 54(b) is denied.

SO ORDERED.

s/ Eric Komitee
ERIC KOMITEE
United States District Judge

Dated: Brooklyn, New York
November 19, 2020

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
74 PINEHURST LLC, 141 WADSWORTH LLC,
177 WADSWORTH LLC, DINO PANAGOULIAS,
DIMOS PANAGOULIAS, et al.,

Plaintiffs,

JUDGMENT
19-cv-6447(EK)(RLM)

-against-

STATE OF NEW YORK, NEW YORK DIVISION
OF HOUSING AND COMMUNITY RENEWAL,
RUTHANNE VISNAUSKAS, et al.,

Defendants.
---------------------------------------------------------- X

A Memorandum and Order of Honorable Eric Komitee, United States District Judge, having been filed on September 30, 2020, granting Defendants' motions to dismiss all claims except the as-applied regulatory-takings claims brought by Eighty Mulberry Realty Corporation and the Panagouliases; dismissing the Pinehurst Plaintiffs' claims against the State of New York and the DHCR for lack of subject-matter jurisdiction, as well as their claims for damages against DHCR Commissioner Visnauskas in her official capacity; it is

ORDERED and ADJUDGED that Judgment is entered in favor of Defendants the State of New York and the DHCR, and in favor of Defendant DHCR Commissioner Visnauskas in her official capacity with respect to damages.

Dated: Brooklyn, NY
February 11, 2021

Douglas C. Palmer
Clerk of Court

By: */s/Jalitza Poveda*
Deputy Clerk

Clerk's Office
Filed Date:

03/05/2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------- X

74 PINEHURST LLC, 141 WADSWORTH LLC, 177 WADSWORTH LLC, DINO PANAGOULIAS, DIMOS PANAGOULIAS, et al.,

Plaintiffs,

JUDGMENT
19-cv-6447(EK)(RLM)

-against-

STATE OF NEW YORK, NEW YORK DIVISION OF HOUSING AND COMMUNITY RENEWAL, RUTHANNE VISNAUSKAS, et al.,

Defendants.

--------------------------------------------------------------------------- X

A Memorandum and Order of Honorable Eric Komitee, United States District Judge, having been filed on September 30, 2020, granting Defendants' motions to dismiss all claims except the as-applied regulatory-takings claims brought by Eighty Mulberry Realty Corporation and the Panagouliases; dismissing the Pinehurst Plaintiffs' claims against the State of New York and the DHCR for lack of subject-matter jurisdiction, as well as their claims for damages against DHCR Commissioner Visnauskas in her official capacity, and a stipulation of voluntary dismissal having been executed by all parties with respect to the as-applied regulatory-takings claims brought by Eighty Mulberry Realty Corporation and the Panagouliases, it is

ORDERED and ADJUDGED that Judgment is entered in favor of Defendants the State of New York and the DHCR; Defendant DHCR Commissioner Visnauskas; Defendants the City of New York, New York City Rent Guidelines Board, David Reiss, Cecilia Joza, Alex Schwartz, German Tejada, May Yu, Patti Stone, J. Scott Walsh, Leah Goodridge, Sheila Garcia, in their official capacities as Chair and Members of the Rent Guidelines Board; and Intervenor-Defendants N.Y. Tenants and Neighbors, Community Voices Heard, Coalition for the Homeless.

Dated: Brooklyn, NY
March 5, 2021

Douglas C. Palmer
Clerk of Court

By: Jalitza Poveda
Deputy Clerk